Carlos CASTANEDA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–99–00008–CR.

Court of Appeals of Texas,
El Paso.

Sept. 21, 2000.

Rehearing Overruled Oct. 18, 2000.

Joe A. Spencer, Jr., El Paso, for Appellant.

Jaime E. Esparza, Dist. Atty., John L. Davis, Asst. Dist. Atty., El Paso, for State.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

Carlos Castaneda appeals his convictions for one count of manslaughter and five

counts of aggravated assault. Finding no reversible error, we affirm.

## FACTS

In June 1996, Patricia Rose Vasquez lived in an apartment with her older sister, Bernadette Apodaca, Apodaca's six-year-old daughter Cindal, Vasquez's small child, and occasionally with Carlos Castaneda, Apodaca's boyfriend. During this time, Castaneda and Apodaca were estranged, and Castaneda was staying with his mother. On the night of June 8, Vasquez was babysitting Cindal while Apodaca went to a boxing match. Vasquez invited six friends over to drink, talk, and play cards: Karina Hernandez, David Romero, Robert Ramirez, Adrian Rivera, Oscar Alvarado, and Felipe Gonzalez. Around 3 a.m., Castaneda angrily barged into the apartment, looking for Apodaca. When told where she was, Castaneda became angrier, as the boxing match was long over. Castaneda asked Vasquez to page her sister, which she did. Apodaca called and spoke with Castaneda, who yelled at her, accused her of being with another man, and threatened her with physical violence if she did not return home. According to the State's witnesses, Castaneda hung up, threw the phone through a wall, threw furniture around the room, and began pushing Vasquez, her son, and her friends out the door. Castaneda's written statement differed in maintaining that he was pushed and verbally provoked by one of the male visitors. It is uncontroverted that Vasquez, her son, and her guests all left the apartment.

Castaneda followed the group downstairs. After some sort of altercation (characterized in Castaneda's statement as a "pushing match"), Felipe Gonzalez sprayed Castaneda with a key-chain canister containing mace, pepper spray, or tear gas. Castaneda retreated to the apartment, found a rifle he kept there, returned downstairs, and began firing at the group. By this time, everyone except Rivera and Alvarado had gotten into one car, and after hearing shots, the group in the car drove Ramirez to a nearby hospital because they thought he had been hit, leaving Rivera and Alvarado behind. Castaneda continued firing at Rivera and Alvarado and shot Alvarado in the back. Alvarado died of the wound. The autopsy showed bullet entry consistent with being hit in a bent-over, running position. Castaneda returned to the apartment and replaced the rifle. The police arrived shortly thereafter.

### Point of Error One: Failure to Disclose Exculpatory Evidence

■ In his first point of error, Castaneda claims he is entitled to a new trial because the State failed to disclose exculpatory evidence. In order to understand this point, we must fully examine the unique facts surrounding the Brady[1] issue here.

Shortly after the shooting, members of Castaneda's family found a plate in the apartment which had been used for cocaine. Apparently, police officers had not seen the plate or had not understood its significance. The family immediately called Joe Spencer, Castaneda's counsel. Spencer instructed them to take pictures of the plate before moving it, then bag the plate and bring it to him. Spencer called the investigating officers and handed the plate over to them. Police testing was positive for cocaine.

At a pretrial hearing held in March 1998, the prosecutor's position on admissibility of the cocaine plate was:

> [T]here's also no evidence to show that the defendants—the witnesses—even knew the cocaine was in the apartment if, in fact, it was found in the apartment, which is still speculative for the fact that it was found and brought forward by the defendant's brother and sister through Mr. Spencer is not relative [sic]. It's

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

not relevant. It's unduly prejudicial and has no probative value in this case.

. . .

There is a picture that there might be something on top of there, but we don't even know if it's a plate full of cocaine. The plate that he has probably wouldn't fit on top of the microwave the way he says it was.

Second of all, we don't know who had access to that apartment after the police officers left. We don't know who has keys. We don't know when these people came in. We don't know what was tampered with or moved around.

We have no definitive evidence as to where that stuff came from if, in fact, it was found in the apartment at all.

. . .

We don't know what it is. For him to say that was definitely it, Your Honor, there is no evidence that these children—these friends—this group of young people were using cocaine and there's definitely no evidence to show that they were the first aggressors.

The trial court granted the State's motion in limine on cocaine use. This was the State's posture until mid-trial: disputing the authenticity of the evidence, impliedly contending that it had been planted by Castaneda's family, and further maintaining that because there was nothing to link it to the victims, it lacked relevance. During the State's case-in-chief, however, this posture suddenly changed. After the jury had been seated and five State's witnesses (including two victim witnesses who had been at the apartment during the altercation), the prosecutor announced:

We're going into the usage of cocaine. They said there were a couple of them that were using the cocaine and I think that was in dispute and any way, I see how it may be relevant to the credibility so we're getting into it, but the thing is we're not waiving its getting into the lab results because there's a problem with the chain and stuff—

The State then called Roberto Ramirez, who had been at the apartment the night Alvarado was killed, and who admitted that he and David Romero had been using cocaine that night. At the time of trial, the State had known for several months that the witness admitted using cocaine on the night of the killing. Castaneda asked for a mistrial based upon prosecutorial misconduct for failing to reveal the witness's admission of cocaine use in a timely manner. He filed a motion for new trial on the same issue.

 The due process clause of the Fourteenth Amendment places upon the prosecution in a criminal case the affirmative duty to disclose evidence favorable to the accused.[2] We commonly referred to this as the *Brady* rule, and to exculpatory evidence as *Brady* material, in homage to the Supreme Court case enunciating the rule. Favorable evidence includes both that which tends to exculpate the accused, and impeachment evidence,[3] because:

Such evidence is 'favorable to the accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.[4]

Here, the undisclosed evidence had both exculpatory and impeachment value which should have been obvious to the State as soon as a prosecutor learned of it.

 The State's position is that nevertheless this presents no reversible error, and indeed no *Brady* violation, for two independent reasons. First, it urges that

2. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

3. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985).

4. *Thomas v. State,* 841 S.W.2d 399, 403 (Tex. Crim.App.1992) (quoting *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380).

because Castaneda and his lawyer knew about the cocaine-tainted plate, and indeed Castaneda's family had found it, the State was under no obligation to disclose Ramirez's admission. This is a situation, the State claims, where the defendant actually knew the facts he claims were not disclosed, and therefore he is not entitled to relief.[5] Second, the State argues that it disclosed the evidence soon enough that Castaneda was able to use it effectively at trial, and for this reason, no *Brady* violation occurred.[6]

Initially, we must disagree with the State's characterization of the undisclosed evidence and consequently, we reject its first argument. This was not just evidence of cocaine use of which defendant and his counsel were already aware; this was an admission of illegal drug use by an eyewitness, shortly before a violent event. Ramirez's admission drastically changed the character of the cocaine evidence: before, the defense would have been forced to speculate on who used the drug and how it got into the apartment. Its value as either impeachment or affirmative evidence on self-defense would have been minimal. Moreover, the State went to trial seemingly willing to suggest that Castaneda's family had planted the drug evidence to help his defense. The State was certainly prepared to assert that nothing tied the drug to its witnesses, and the existence of the cocaine was of no relevance to this prosecution. After Ramirez's admission of cocaine use, however, the exculpatory value of this evidence increased dramatically. We therefore disagree that this is a situation where the *Brady* evidence was already known to the defendant; the evidence in question is not the cocaine-tainted plate, but the *admission* by Ramirez which Castaneda was completely unaware until well into the State's case-in-

chief. We therefore reject the State's first argument and reach its second theory.

■ We have already determined that Ramirez's admission that he and at least one other person present at the apartment had used cocaine had both impeachment and exculpatory value to Castaneda's defense. Whether evidence is favorable to the accused, however, is only one branch of a three-prong test we use to determine whether reversible *Brady* error has occurred. A due process violation occurs when a prosecutor: (1) fails to disclose evidence; (2) which is favorable to the accused; (3) that creates a probability sufficient to undermine the confidence in the outcome of the proceeding.[7] We must therefore next examine the circumstances surrounding failure to disclose, and the materiality of the evidence to the trial.

■ As to failure to inform the defense, the State had knowledge of the exculpatory evidence for some months before trial, and made no attempt to disclose it to Castaneda. Prosecutor Lark Saad interviewed Ramirez in March 1998 and learned that Ramirez was admitting to cocaine use. She did not speak to defense counsel about this, nor note it in the file. She left the district attorney's office before the case was tried in October 1998. Testifying at the motion for new trial, she did not recall telling her successors assigned to this case about Ramirez's admission. Gerald Cichon, who ultimately prosecuted the case, testified that he realized Ramirez admitted using cocaine in September 1998, "right before the trial." Although there may be have been a failure of communication among the prosecutors assigned to this case, that will not excuse the State from performing its constitutional duty. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's be-

5. *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim.App.1999); *State v. DeLeon*, 971 S.W.2d 701, 706 (Tex.App.—Amarillo 1998, pet. ref'd).

6. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim.App.1999).

7. *Thomas*, 841 S.W.2d at 404.

half in the case, including the police.... [T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."[8] We conclude the prosecution failed to disclose.

Finally, we must determine whether the failure to disclose created a probability sufficient to undermine our confidence in the outcome of the proceeding. This is the second reason the State urges for affirming the case. Usually, a determination that the materiality prong has been met involves the strength of the exculpatory evidence balanced against the evidence supporting conviction.[9] Here, however, our analysis does not focus on the quality of the evidence, but rather on the defense's ability to make use of it when it was tardily disclosed. We find the defense was able to make skillful use of the cocaine evidence, that the jury was fully informed on this issue, that cross-examination was thorough, that expert testimony on the issue was presented, and that our confidence in the verdict here remains unshaken. Specifically, the defense was able to use the evidence in the following ways:

Counsel extensively cross-examined Ramirez on his cocaine use on the night of the shooting.

Counsel cross-examined the police officers who had interviewed Ramirez and Romero (the other individual who had admittedly been using the cocaine).

Counsel cross-examined Adrian Rivera about cocaine use at the apartment, although Rivera denied having used it himself.

Castaneda's expert, an emergency medicine physician, testified on the effects of cocaine usage, including the possibility that it could make an individual fearless and aggressive.

Moreover, defense counsel had a weekend recess before completing his cross-examination of Ramirez and a day after the State rested its case to prepare for use of the undisclosed evidence. We conclude that the third prong of the *Brady* test has not been met. The defense made effective use of the cocaine evidence despite its later disclosure.

Nevertheless, this court wishes to make clear that we will not hesitate to reverse a case for *Brady* violations, should we have doubts about the fairness of the resulting conviction. The State should have disclosed this favorable evidence months before it did. That there was a personnel change at the district attorney's office, and a failure to communicate between the prosecutors assigned to this case, does not excuse a violation. As the U.S. Supreme Court has cautioned:

Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.' And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.[10]

---

**8.** *Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490 (1995).

**9.** *See Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384; *Thomas,* 841 S.W.2d at 405.

**10.** *Kyles,* 514 U.S. at 439–40, 115 S.Ct. at 1568 (citations omitted).

With this caveat, we are constrained to find that no reversible error occurred here. Point of Error One is overruled.

## Point of Error Two: Testimony From Witness Not Included on Witness List

■ In his second point, Castaneda contends that the trial court erred in admitting rebuttal testimony from a witness who had not been timely placed on the State's witness list. Rosa Maria Torres, a neighbor in the apartment complex, testified that she lived in the apartment complex, and at approximately 3 a.m., she was awakened to sounds of happy, laughing voices. She went to her window, looked out, and saw a group of kids laughing and talking, as though they were saying goodnight. As she returned to bed, she heard angry shouts, she looked out the window again, and she saw another man shouting angrily. She saw that the kids were in two cars: one car left with some of the kids inside it and the other car remained parked. She then heard a shot and noticed young men hiding under a car.

■ Upon request, the State must give notice of whom it intends to call as a witness.[11] If the trial court allows an undisclosed witness to testify, we review the decision for abuse of discretion.[12] Among factors we consider are any showing of bad faith by the prosecutor in failing to disclose, and whether the defendant could reasonably anticipate that the witness would testify, even though his or her name was omitted from the witness list.[13] In other words, unless the defendant can show that the omission of a name from the State's witness list resulted from the prosecutor's bad faith, or that the calling of such a witness could not have reasonably been anticipated by the defendant, the trial court's decision to allow the testimony will not be disturbed on appeal.[14]

Here, the trial court signed a standard discovery order requiring disclosure of the State's witnesses. The State filed and issued a subpoena for Torres on September 3, 1998, but the subpoena was not placed in the district attorney's file until the day Torres testified, October 6. Nevertheless, the trial court twice stated on the record that defense counsel received notice that Torres was a potential State's witness on September 29, a week before she testified. Castaneda did not refute the court's statement. Thus, the trial court impliedly found that providing notice to the defense one week before calling Torres as a rebuttal witness did not, of itself, indicate bad faith.[15] We cannot find any abuse of discretion in that decision.

Castaneda also asserts that he could not have reasonably anticipated Torres being called as a witness because there were numerous other apartment residents who might have seen or heard the night's events. Also, Castaneda's investigator made several efforts to determine who was under subpoena by reviewing the district attorney's file, but Castaneda could not have anticipated this witness because the subpoena was not in the file before October 6. As noted above, however, Castaneda could have reasonably anticipated Torres

---

11. *Stoker v. State*, 788 S.W.2d 1, 15 (Tex. Crim.App.1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) (citing *Young v. State*, 547 S.W.2d 23, 27 (Tex.Crim. App.1977)); *Sullivan v. State*, 997 S.W.2d 374, 376 (Tex.App.—Beaumont 1999, pet. ref'd).

12. *Stoker*, 788 S.W.2d at 15.

13. *Id.* (citing *Hightower v. State*, 629 S.W.2d 920, 925 (Tex.Crim.App.1981)).

14. *See Baker v. State*, 797 S.W.2d 406, 409 (Tex.App.—Fort Worth 1990, pet. ref'd) (cit-

ing *Bridge v. State*, 726 S.W.2d 558, 566–67 (Tex.Crim.App.1986)).

15. *See Nobles v. State*, 843 S.W.2d 503, 515 (Tex.Crim.App.1992), *cert. denied*, *Nobles v. Johnson*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998) (reviewing record, which shows that notice of witness's name was file marked five days prior to start of State's direct evidence and eight days before witness was actually called, and determining that State did not engage in bad faith).

being called as a witness because he had notice of her anticipated testimony on September 29.[16] Further, Castaneda could have requested a continuance to interview Torres or investigate her testimony further, but did not do so. We find no abuse of discretion in allowing the testimony, and consequently no error. Point of Error Two is overruled.

### Points of Error Three through Ten: Jury Charge Exclusions

A central issue at trial was whether the jury would be charged on self-defense. Over the State's objection, the jury was so instructed.[17] Castaneda also requested a series of embellishments on the issue of self-defense. Castaneda complains of the trial court's refusal to submit this instruction in his points three through ten on appeal. Specifically, Castaneda complains that the trial court erred in excluding his requested jury instruction on necessity, justification, "right to arms," "right to shoot to scare," and "right to pursue."

■■■■ The trial court must give a jury instruction on every defensive theory raised by the evidence regardless of whether it is strong, feeble, impeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief.[18] A charge on a defensive issue is required if the accused presents affirmative evidence that would constitute a defense to the crime charged and a jury charge is properly requested.[19] If a

defendant produces evidence raising each element of a requested defensive instruction, he is entitled to the instruction regardless of the source and strength of the evidence.[20] If the issue is raised by any party, refusal to submit the requested instruction is an abuse of discretion.[21] Where the evidence fails to raise a defensive issue, however, the trial court commits no error in refusing such a request.[22]

### Necessity

■■■■ To determine whether the issue of necessity was raised, we view the evidence in light of the statutory provision.[23] The Texas Penal Code provides that the defense of necessity is available for criminal conduct only if there is evidence which, if believed, would establish: (1) the defendant reasonably believed his conduct was immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweighed the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.[24] "Imminent harm" means an emergency situation, and it is "immediately necessary" to avoid that harm when a split-second decision is required without time to consider the law.[25]

To support his necessity theory, Castaneda points to two pieces of evidence: his written statement and the testimony of Dr. Juan Fitz, a medical doctor who testified about the medical and emotional ef-

---

16. *See Bridge,* 726 S.W.2d at 567 (finding that defendant could have reasonably anticipated police officer's testimony at trial because State had orally informed defense week before, after suppression hearing that officer would be called as witness).

17. Much of the State's argument on appeal is that the self-defense charge was improper because the evidence was uncontroverted that Castaneda could have retreated. We do not reach this argument as we dispose of the appellant's points on other grounds.

18. *Brown v. State,* 955 S.W.2d 276, 279 (Tex. Crim.App.1997).

19. *McGarity v. State,* 5 S.W.3d 223, 226 (Tex. App.—San Antonio 1999, no pet.).

20. *Id.*

21. *Id.*

22. *Id.* at 227.

23. *Id.*

24. *Id.* (citing TEX. PENAL CODE ANN. § 9.22 (Vernon 1994)).

25. *Id.*

fects of tear gas, mace, and pepper sprays. Castaneda's statement reads:

This kid challenged me to a fight with him. Everyone walked outside and downstairs. This guy and I got into a pushing match. We did not get into a fist fight, so I turned around and started to walk up the stairs. Someone punched me twice on the shoulder and back.

When I turned around, I got maced, but I could not tell who had done this. I managed to get upstairs to the apartment. I went inside the bedroom and picked up the .22 caliber Marlin rifle which normally has one live round.[26]

The medical testimony upon which he relies is:

If you're in a situation where you're not aware of your surroundings and something falls into your face with the significant burning, the first thing a person has there's something very caustic.

By that meaning, something very bad has fallen to you so it causes more panic. The closer it is to the face, the more the concentration is of that spray to go into the nose and into the eyes and into the mouth.

Rather than raising the defense of necessity, we find this evidence demonstrates that Castaneda had ample time to consider the law. It is undisputed that no one followed Castaneda back to the apartment. Rather, he retreated alone, though perhaps panicked from the spray. Although no one had pursued him, he entered the bedroom, found the rifle, left the apartment, and descended the flight of stairs before firing into the night. This simply does not raise an issue on necessity. Because he has not shown that he reasonably believed his conduct was immediately necessary to avoid imminent harm, the trial court did not err

**26.** Castaneda's statement then goes on to read: "Everyone started to leave and I walked to the parking lot and noticed they had not left and I fired twice, but I did not notice anyone get hit."

**27.** TEX. PENAL CODE ANN. § 9.02 (Vernon 1994) (emphasis added).

in denying Castaneda's request for a necessity instruction in the jury charge. Point of Error Three is overruled.

### Justification

■ Defense counsel requested an instruction that:

It is a defense to prosecution that the conduct in question is justified. Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, Carlos Castaneda, on or about the 8th day of June 1996, in the County of El Paso, and State of Texas, as alleged in the indictment, did then and there cause the death of an individual, Oscar Alvarado, and you find that the defendant, Carlos Castaneda, was justified in causing the death of Oscar Alvarado, you will find the defendant not guilty, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict, quote, not guilty, unquote.

Section 9.02 of the Texas Penal Code provides that "[i]t is a defense to prosecution that the conduct in question is justified *under this chapter*." [27] Castaneda relies upon that general statutory language in urging that he was entitled to this instruction. We find this reliance is misplaced; there is no general defense of justification under the Penal Code. Justifications for what would otherwise be criminal conduct, such as necessity and public duty, are separately set out, and Section 9.02 merely explains that it is a defense to prosecution that the conduct in question is justified.[28] Point of Error Four is overruled.

**28.** *See Giesberg v. State,* 984 S.W.2d 245, 248 n. 2 (Tex.Crim.App.1998), *cert. denied,* 525 U.S. 1147, 119 S.Ct. 1044, 143 L.Ed.2d 51 (1999) (noting that justifications for conduct are set out in Chapter Nine of Texas Penal Code).

### "Right To" Defenses

 With regard to Castaneda's right to arms, right to shoot to scare, and right to pursue requests, we find the trial court was correct in refusing any separate instructions. In *Giesberg v. State,*[29] the Texas Court of Criminal Appeals held that any defensive theory not recognized or specifically labeled either a defense or an affirmative defense by the legislature does not warrant a separate instruction.[30] The Texas Penal Code recognizes the general defenses of insanity, mistake of fact, mistake of law, intoxication, duress, entrapment, and age affecting criminal responsibility.[31] Chapter Nine outlines justifications absolving a defendant of criminal responsibility, such as public duty, necessity, self-defense, and defense of third persons.[32] Castaneda has not shown, nor do we find, that "right to arms," "right to shoot to scare," and "right to pursue," are defenses recognized by the Texas Penal Code. Accordingly, under *Giesberg*, Castaneda was not entitled to such instructions.[33]

Points of Error Five, Six, Seven, Eight, Nine, and Ten are overruled.

### CONCLUSION

Finding no error, the judgment of the trial court is affirmed.

---

29. 984 S.W.2d 245, 250 (Tex.Crim.App.1998), *cert. denied,* 525 U.S. 1147, 119 S.Ct. 1044, 143 L.Ed.2d 51 (1999).

30. *Giesberg*, 984 S.W.2d at 247, 250 (noting that term defense should not be used for issue that has not been specifically labeled as such by legislature); *Roise v. State,* 7 S.W.3d 225, 242–43 (Tex.App.—Austin 1999, pet. ref'd).

31. Tex. Penal Code Ann. §§ 8.01–.07 (Vernon 1994 & Supp.2000).

32. *Id.* at §§ 9.02, 9.21–.22, 9.31–.33.

33. The trial court did instruct the jury on the defendant's right to arm. The self-defense portion of the charge read in pertinent part:
 You are instructed, in connection with the right of self-defense, that if you find from the evidence that shortly prior to the killing or threatening, the Defendant reasonably apprehended an attack upon his person by the deceased or by those persons with the deceased, then the fact that the Defendant armed himself with a firearm would in no way impair or lessen his right of self-defense because he would have a right to so arm himself if he reasonably feared such an attack.