COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| MARY JEAN WHIPPLE, | | No. 08-06-00202-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 384th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20030D05163) |
| | § | |

## O P I N I O N

Mary Jean Whipple appeals her conviction of murder. A jury found Appellant guilty and assessed her punishment at imprisonment for ninety-nine years. Finding no error, we affirm.

### FACTUAL SUMMARY

Appellant was convicted of murdering her seventy-one-year-old business partner, Art Loustaunau, by shooting him in the chest with a firearm on August 7, 2003. In finding Appellant guilty, the jury impliedly rejected Appellant's claim of self-defense. Because Appellant challenges the legal and factual sufficiency of the evidence supporting the jury's rejection of her defensive theory, we will set forth the evidence in considerable detail.

*The Prior Relationship*
*Between Appellant and Loustaunau*

Loustaunau had been married to Pauline Loustaunau for forty-seven years at the time of his

death. He and Appellant had operated a bingo hall together since 1994 or 1995. Appellant often complained that he was short-changing her financially and owed her money. In addition to the business relationship, Loustaunau had an affair with Appellant, who was about twenty years younger than he and also married. In 2001, Appellant divorced her husband, James "Buck" Whipple. She expected Loustaunau to divorce his wife so they could marry, but he did not do so. Appellant told others before the shooting that she and Loustaunau were no longer romantically involved, but it is not clear from the record when that aspect of their relationship ended.

In addition to her complaints about the business, Appellant accused Loustaunau of being physically, emotionally, and sexually abusive. She claimed he used the knowledge that she had been sexually abused by her father to manipulate her. Defense witness Mike Olivares, one of Loustaunau's business partners, testified that Loustaunau was dominant, manipulative, and verbally abusive towards Appellant. The defense introduced into evidence a police report dated October 14, 2000 in which both Appellant and Loustaunau complained of being assaulted by the other.

But the State introduced evidence that Appellant had threatened to kill Loustaunau on more than one occasion and had committed acts of violence against him. Albert Guerra recalled that Appellant and Loustaunau argued most of the time they were together and Appellant often screamed at Loustaunau. During one argument, he saw Appellant shove Loustaunau and kick the side of his car. Guerra had also heard Appellant threaten to kill Loustaunau as well as herself.

Loustaunau's son, Raymond "Bo" Loustaunau, testified that in 1998 or 1999, he was in El Paso visiting his parents. His father received a telephone call indicating a problem at the office and Bo accompanied him to check it out. Bo did not want to meddle in his father's business so he remained just outside the door in the hallway, but he could smell a strong odor of gasoline. When

Loustaunau entered the office, Appellant yelled that he had ruined her life and she called him vulgar names. When Bo heard his father grunt loudly as though he had been hit in the stomach, he entered the room and found him down on the floor. Appellant was kicking him in the stomach and groin while trying to strike a match to light the gasoline that she had poured throughout the office. Loustaunau was terrified and unable to defend himself. Bo placed Appellant in a bear hug to prevent her from setting his father and the office on fire. He picked her up and carried her to the couch and held her down. Appellant continued to struggle and say "horrible things" to Loustaunau. To this point, Bo did not know that Appellant and his father had been having an affair but Appellant's comments revealed this to be true. Bo said that it took all of his might to hold Appellant. His father tried but was not successful in his efforts to calm Appellant. She did not calm down until her husband arrived several minutes later.

Rene Gonzalez, another of Loustaunau's business partners, testified that Appellant often complained about Loustaunau. On one occasion, Appellant arrived at Loustaunau's office with a gun and threatened to kill both Gonzalez and Loustaunau before killing herself. It took Loustaunau 35 to 40 minutes to convince Appellant to put the gun away. Afterward, Loustaunau asked Gonzalez to not call the police. On another occasion, Loustaunau learned that someone had crashed into his car in the parking lot. He found Appellant sitting in her pickup a short distance away from his own damaged car. Loustaunau confronted Appellant and they argued for a while before leaving together.

*The Disappearance*

The day before the shooting, Loustaunau had dinner with his cousin, Rafael Loustaunau. Over a one and a half hour period, Appellant called Loustaunau's cell phone eight to ten times. Loustaunau did not answer any of the calls but his facial expressions indicated to Rafael that he was

worried.  Concerned about an argument he was having with Appellant, Loustaunau asked Rafael to follow him home.  Rafael did so and he waited outside until Loustaunau was safely inside.

The following day, Loustaunau, dressed in a sweat suit, left his house for the bingo hall at 6 a.m. as he typically did.  Cell phone records showed that Appellant called Loustaunau's cell phone several times that morning between 7 and 8 a.m.  He returned home shortly after 8 a.m. and told his wife, Pauline, that he was going to the gym but he wanted to get a change of clothes in the event he went straight to the office after his workout.  Before he left, he asked Pauline to retrieve a manila envelope containing money from their bedroom dresser drawer.  Pauline got the envelope, which she described as "bulky," and gave it to him.  Loustaunau left at around 8:45 a.m., and Pauline never saw him again.

Albert Guerra, a bingo hall employee, spoke with Loustaunau on the phone sometime between 9 and 9:30 that same morning.  Loustaunau asked him to get some deposit books and checks from his desk and meet him at Loustaunau's house at 1 p.m.  Guerra went to the house at 1, but Loustaunau never showed up.  Guerra talked with Pauline and left the deposit books and checks with her.  During the remainder of the day, Guerra tried to contact Loustaunau both in person and by phone but he could not locate him.  Pauline was not overly concerned when her husband did not come home for dinner because he often worked late, but she became concerned when one of his employees called that evening looking for him.  She did not sleep at all that night and she began looking for her husband early the following day.

Upset and worried, Pauline called Guerra at 7 a.m. the next morning and told him that Loustaunau had not come home.  Guerra told her he would make some calls and try to find him.  He immediately got in his truck and drove to Appellant's house to look for Loustaunau.  When Guerra

-4-

pulled up in front of the house, he saw Appellant standing in the front yard watering her lawn. As soon as she saw him and their eyes met, she dropped the hose and ran inside. He waited to see if she would come back out, but she did not and he left. Guerra returned to the bingo hall and waited with another of Loustaunau's business associates, Hector Mena, to see if Loustaunau would show up. At 1 p.m., they called Bo in Fort Worth and told him that his father was missing. Bo caught the next flight to El Paso and arrived at 6:30 that same evening. In the meantime, Guerra continued calling Loustaunau's cell phone. Before Bo arrived, Guerra drove to Appellant's house again and noticed that some of the vehicles had been moved around since that morning and a that motorcycle was in the back of Appellant's pickup. He did not see Appellant.

Upon hearing the news that his father was missing, Bo immediately suspected that Appellant had killed his father based on her prior history of threats and violence. Shortly after arriving in El Paso, Bo called the police department and reported his father as missing. A police officer went to Appellant's house but was unable to make contact with her. In the meantime, Bo met with Guerra, Mena, and Rafael and put a plan together to look for Loustaunau. They looked at the phone records and saw, based on the timing of the calls, that "everything pointed to [Appellant]." Bo called Appellant several times but she did not answer. Consequently, he left messages telling her that his father was missing and he was looking for him, but she did not return his calls. They also went to Appellant's house but she either was not at home or would not answer the door. Bo noticed that a light had been turned on which led him to believe Appellant was in the house. Bo took Guerra, Mena, and Rafael home at around 10:30 p.m., and then returned to Appellant's house. He parked two houses down where he was partially concealed by some bushes but still had a clear view of her house. Bo remained there most of the night and left only for about an hour and a half to drive around

looking for his father's Lexus. He did not see any activity around the house the entire night. After the sun came up, Bo drove to the gym where his father worked out but they had not seen him. He also went to the Pebble Hills police substation to see if he could get some assistance. He informed the police of his suspicions about Appellant but the sergeant he spoke with told him that they did not have enough evidence to get a search warrant for her house. Bo then decided he would drill some holes in Appellant's garage door and look inside for his father's Lexus. By the time he returned to Appellant's house with the drill, the police were there and they eventually made entry into the house. Bo waited outside for a long while before he saw the detectives exit to get cameras and put crime scene tape around the area. At that point he knew that his father's body had been found and one of the detectives confirmed that they had found a body.

*Appellant's Activities*

While Guerra and others were looking for Loustaunau on Friday, August 8, Appellant spent time with her friends, Brian and Stella Phelps. The couple was moving to Oregon and Appellant agreed to help them move their motorcycle in her pickup. The Phelpses planned to leave Friday afternoon and stop in Colorado Springs to visit with Stella's parents. Appellant intended to leave on Saturday and meet them in Colorado Springs before they traveled on to Oregon together. Appellant arrived at the Phelpses' house at around 2 on Friday afternoon and helped Stella clean. She initially seemed fine but Stella noticed that Appellant was upset and agitated. Appellant began to cry because she was worried that Loustaunau would see the motorcycle on her pickup. Stella told Appellant not to worry about it. The Phelpses left the house sometime between 4 and 6 that same evening.

*Appellant's Statements to Teresa Gutierrez*

On Saturday morning, August 9, Appellant's friend, Teresa Gutierrez, was getting ready for work. She was listening to her phone messages at 7:15 a.m. when she heard a message from Appellant. Concerned that Appellant had called her so early, Gutierrez immediately returned the call. Appellant sounded disoriented and asked if she could come over. Gutierrez said she was on the way to her office and asked Appellant to meet her there. But Appellant was on foot so Gutierrez picked her up. It was obvious to Gutierrez that Appellant had been crying and had not slept. When Gutierrez asked what was wrong, Appellant began crying so hard that she could hardly speak. She finally said that "a horrible accident had happened and that she had accidentally shot [Loustaunau]." Gutierrez knew about Appellant's relationship with Loustaunau. Gutierrez believed the shooting had just happened and she said they should call the police and an ambulance. Appellant continued to cry and finally said that they could not call an ambulance because he was dead. Appellant told Gutierrez that she did not mean for it to happen, it was an accident, and she did not want to go to hell for it. She also said she wanted to do the right thing. Gutierrez replied that they had to call the authorities and tell them what happened. Appellant then explained to Gutierrez that she had mutilated Loustaunau's body and didn't know why since she couldn't stand the sight of her own blood. At that point, Gutierrez suggested that Appellant speak with a pastor or someone who could help her, and she thought of a psychologist she had seen on a professional basis, Dr. Karen Gold. With Appellant's permission, Gutierrez called Dr. Gold and made an appointment for 1:00 that afternoon.

Gutierrez waited with Appellant and continued to talk with her before going to Dr. Gold's office. During this time, Appellant told Gutierrez that Loustaunau had come over to her house to

mow the lawn but she did not want him to do it. Gutierrez did not know whether Loustaunau had actually mowed the lawn, but at some point he went to the store and returned with some beer which they drank. They began arguing because he did not want her to leave El Paso. Appellant had told him she was traveling to Oregon with friends who were moving and she was going to look for work while she was there. They also argued because he wanted to have sex with her before she left. As they argued, Appellant walked down the hallway and retrieved a gun that she had on a shelf. She told Gutierrez, "I did what I always do, Teri, I went and got my gun." Gutierrez knew that Appellant customarily threatened to kill herself when they fought, Loustaunau would calm her down and take the weapon away, and they would come to terms with the issue causing the argument. Thus, Gutierrez understood Appellant's comment to mean that she got the gun intending to threaten to kill herself. Appellant told Gutierrez that Loustaunau was standing close to her and the gun accidentally fired. Appellant denied pulling the trigger and thought Loustaunau might have bumped into her causing the gun to accidentally fire. She did not know whether the bullet had struck Loustaunau. The gun shot startled both of them and they stood there staring at each other. Appellant took a step back from Loustaunau and then he suddenly charged at her. She put her arm up over her face because she believed Loustaunau was going to hit her but he suddenly fell to the floor. Gutierrez asked Appellant whether she remembered pulling the trigger, and she said, "Well, I guess I did. She said, Yes, I -- I -- I shot [Loustaunau] and he fell to the floor." Appellant recalled Loustaunau telling her it was not her fault and he knew it was an accident. Appellant did not know how many times she shot him but thought it was once.

*Appellant's Statements to Dr. Karen Gold*

Dr. Karen Gold is a clinical and forensic psychologist and a forensic consultant. On

August 9, she received a telephone call from a patient, Teresa Gutierrez, around 7:30 a.m., advising her that a friend wanted a consultation for crisis intervention. Dr. Gold scheduled the appointment for 1:00 that afternoon. Upon their arrival, Dr. Gold took Appellant and Gutierrez into the therapy area. Gutierrez stayed in the room at first to "break the ice" but she soon left and waited in the kitchen. Dr. Gold asked Gutierrez to come back in the room and sit with Appellant on a few occasions. Dr. Gold met with Appellant from 1 p.m. until about 7:40 p.m. that evening.

Appellant told Dr. Gold that she had done a terrible thing and wanted to make it right. She had shot Art Loustaunau and wanted to know if Dr. Gold could help her. Loustaunau was dead and his body was in her home. They were arguing about the proceeds of a business they operated jointly. Dr. Gold told Appellant that she should get legal advice and she asked for Appellant's permission to try to contact a lawyer. Appellant agreed. Dr. Gold called several attorneys but only one, William Ellis, was willing to come. While waiting for Ellis, Dr. Gold continued to talk with Appellant. Appellant explained that she had been in a long-term relationship with Loustaunau and that he had called her that morning wanting to come over to do some yard work. She resisted at first, but eventually they worked in her yard together. After they finished, Loustaunau wanted to take her to dinner, but Appellant didn't feel like it. Loustaunau left to buy beer and steaks. When he returned, they drank a significant amount of beer and began to argue about the money he owed her from their business. Appellant told Dr. Gold that he owed her more than $20,000 and said she had been upset about this for a long time. They also argued because she was leaving for Oregon and he wanted to have sex with her before she left. Appellant told Loustaunau that part of their relationship was over but he persisted. She said no and walked into a hallway near the kitchen. She looked down and saw a gun in her right hand. As she was looking at the gun, it suddenly fired. When the gun discharged,

-9-

Loustaunau was in the hallway near the kitchen. Appellant was surprised that Loustaunau continued to approach her, but he did. She warned him not to come any closer or she would shoot him, but he lunged at her and the gun fired twice more. After he fell to the floor, Appellant cried and asked for his forgiveness. Loustaunau said, "I love you, Babe. Call 911." After realizing that Loustaunau was dead, Appellant became frightened and decided to get rid of the body. She told Dr. Gold that she consulted a book on butchering and then cut up the body with a meat cleaver.[1] Appellant said that it took a long time to dismember the body because Loustaunau was a big man. She started dismembering the body at dusk on Thursday and did not finish until the early hours of the following morning. Appellant put the body parts in plastic bags and stored them in her freezer. Appellant also explained to Dr. Gold that it was hard work but she had cleaned up all the blood. She then wandered around aimlessly "catching catnaps in yards" until she phoned Gutierrez that morning. Appellant was startled when she learned it was Saturday because she thought only twenty-four hours had elapsed since the shooting. At some point, Appellant told Dr. Gold that there was a duffel bag in her home containing $20,000 and she expressed concern about getting someone she trusted into the house to retrieve it. She told Gutierrez that she wanted the money to be given to her mother.

William Ellis arrived at about 2:30 p.m. and met privately with Appellant. After Appellant retained him, Ellis drafted a consent-to-search form which Appellant signed and Dr. Gold witnessed. The consent-to-search was limited to the freezer in Appellant's garage. Appellant told Ellis about the bag of money in her house which was to be used as a retainer for his legal services. At approximately 6 or 7 p.m., Ellis went to Appellant's house and entered with some detectives. Ellis

[1] When searching Appellant's home pursuant to a search warrant, the police recovered a meat cleaver and a book entitled, "Basic Butchering."

-10-

and the detectives retrieved the duffel bag and counted the money in the kitchen. They determined that the bag contained $21,041 and the money was turned over to Ellis. The detectives, in Ellis' presence, then entered the garage and opened the freezer. Detective Arturo Ruiz saw several black plastic bags and opened one. Upon seeing a human head, he replaced the bag in the freezer, declared the house a crime scene, and ordered everyone out. He subsequently obtained a search warrant for the premises and a warrant for Appellant's arrest.

*Appellant's Statements to the Phelpses*

Appellant called the Phelpses on Saturday, August 9, at 5 or 6 p.m. and told them she had killed Loustaunau because he had tried to rape her. She was sorry that she could not bring them the motorcycle. Stella knew that Appellant and Loustaunau had an affair in the past and that Appellant was no longer romantically involved with him.

*Examination of the Body*

Dr. Corinne Stern, a forensic pathologist and the medical examiner, was called to Appellant's house on the morning of August 10 to remove body parts found in the freezer. She removed six black plastic bags and one clear Zip-Lock bag containing a total of 110 body parts. At the morgue on August 12, Dr. Stern reassembled the parts and determined that the torso and its internal organs were missing. Detective Ruiz notified Appellant's attorney, William Ellis, that the torso was missing. The following day, Ellis accompanied the detectives to an area in the desert where Appellant had told him the torso could be found. But the officers were unable to find it despite looking for several hours. Appellant accompanied Ellis and the detectives the following day and she showed them exactly where the torso was buried. The excavation process took several hours. Dr. Stern subsequently examined the torso and determined that the cause of death was multiple

gunshot wounds, two in the chest and one in the axilla or armpit. She also determined that one of the gunshot wounds in the chest had a downward path indicating that Loustaunau had been shot while bending over, lying on the ground, or kneeling. Due to the condition of the remains, Dr. Stern could not determine the path of the second shot to the chest or the armpit, but the arm had to have been raised when Loustaunau was shot in the armpit. Because there was no gunpowder stippling around any of the wounds, Dr. Stern concluded that the gun was more than eighteen inches from the body when fired.

Dr. Stern's examination of the body revealed several antemortem injuries including bruises on the arms and wrists and a laceration on one of the arms caused by blunt force trauma. She also found a through-and-through puncture wound to the right forearm which had been caused by a sharp instrument such as an ice pick or a screwdriver. She concluded that this wound had also been caused while Loustaunau was still alive. Additionally, Dr. Stern noted postmortem lacerations on the shoulders caused by a sharp instrument such as a knife, scalpel, or a cleaver. Dr. Stern recovered enough liver tissue to run a complete drug and alcohol screen. Contrary to Appellant's statements that they had consumed a lot of beer, there was no alcohol in Loustaunau's system.

Dr. Stern sent some of the bones to Dr. Harold Gill-King, a forensic anthropologist, for examination. He determined that the long bone fragments and vertebrae fragments had been cut with some type of manual saw with a straight blade approximately one millimeter wide. In his opinion, a hacksaw found in Appellant's garage was consistent with the class of saws that could have been used to cut the bones.

*The Defensive Evidence*

Curtis Flynn, an accident reconstruction expert, was hired in 2005 to investigate a bullet hole

in a cabinet door in Appellant's kitchen that had been missed by the police in their investigation. Flynn performed a trajectory analysis and determined that the shooter was standing in the hallway and the gun was pointed downward. This evidence tended to support Appellant's claim that the gun accidentally discharged when she was in the hallway and holding the gun out to her side.

The defense also offered evidence that Appellant had suffered a brief reactive psychosis after the shooting. Dr. Angel Rodriguez-Chevres, a psychiatrist, examined Appellant for competency and sanity purposes. He concluded, based on his interview of Appellant and the records he reviewed, that Appellant was so traumatized by the shooting that she disassociated from reality. In his opinion, Appellant knew right from wrong at the time she shot and killed Loustaunau, but she was in a psychotic state at the time of the dismemberment. The brief reactive psychosis could have ended before she went to the Phelpses house the next day.

Another psychiatrist, Dr. Arthur Ramirez, offered his opinion that Appellant suffered from Battered Woman Syndrome. Like Dr. Rodriguez-Chevres, he also opined that Appellant experienced a break from reality during the dismemberment. During cross-examination, Dr. Ramirez said he was surprised to learn that Appellant had been able to tell both Gutierrez and Dr. Gold about the dismemberment as this would be inconsistent with a finding of brief psychotic episode.

## LEGAL AND FACTUAL SUFFICIENCY

In Point of Error One, Appellant contends that the evidence is legally and factually insufficient to support the jury's rejection of her self-defense claim. Self-defense is a justification for otherwise unlawful conduct. *Giesberg v. State*, 984 S.W.2d 245, 249 (Tex.Crim.App. 1998). A person is justified in using force against another when and to the degree that she reasonably believes the force is immediately necessary to protect herself against the other's use or attempted use

of unlawful force. TEX.PENAL CODE ANN. § 9.31(a)(Vernon Supp. 2007). A person is justified in using deadly force against another (1) if she would be justified in using force against the other under Section 9.31; (2) if a reasonable person in the actor's situation would not have retreated; and (3) when, and to the degree that she reasonably believes the deadly force is immediately necessary either to protect herself against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. TEX.PENAL CODE ANN. § 9.32(a)(Vernon 2003). The Penal Code defines "deadly force" as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. at § 9.01(3).

An accused bears the burden of production with respect to defenses, requiring her to raise evidence that supports the defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex.Crim.App. 2003); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991). Once the defendant has met this burden, the State then shoulders the burden of persuasion to disprove the defense. *Zuliani*, 97 S.W.3d at 594. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. *Id.* When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Id.*

*Sufficiency Standards of Review*

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must review all the evidence, both State and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61

-14-

L.Ed.2d 560 (1979); *Lane v. State*, 151 S.W.3d 188, 191-92 (Tex.Crim.App. 2004). We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843. When an appellant challenges the legal sufficiency of the evidence supporting a fact finder's rejection of a non-affirmative defense, we look not to whether the State presented evidence that refuted the appellant's defense, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also could have found against the appellant on the defensive issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *Davidson v. State*, No. 08-04-00117-CR, 2006 WL 1036736, at *4 (Tex.App.--El Paso, April 20, 2006, no pet.)(not designated for publication); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex.App.--Fort Worth 2004, pet. ref'd).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *See Zuniga v. State*, 144 S.W.3d 477, 481 (Tex.Crim.App. 2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Id.* at 484. There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the

finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Id.* This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. *Id.* at 485. In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt. *Id.* In performing a factual sufficiency review, we are to give deference to the fact finder's determinations, including determinations involving the credibility and demeanor of witnesses. *Id.* at 481. We may not substitute our judgment for that of the fact finder. *Id.* at 482. When reviewing the factual sufficiency of the evidence in the context of the jury's rejection of a non-affirmative defense, we employ the *Zuniga* standard of review because once the defendant has met her burden of production of evidence as to a defense, the State bears the burden to prove the defendant's guilt of the charged offense beyond a reasonable doubt. *Roy v. State*, 161 S.W.3d 30, 37 (Tex.App.--Houston [14th Dist.] 2004, no pet.); *Dotson*, 146 S.W.3d at 291. Thus, we review all of the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the finding of guilt beyond a reasonable doubt and weighing all of the evidence, the evidence supporting the defense is strong enough that the fact finder's rejection of the defense does not meet the beyond-a-reasonable-doubt standard. *Davidson*, 2006 WL 1036736, at *4.

The legal and factual sufficiency standards of review are the same for cases based on direct and circumstantial evidence. *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim.App. 2000). In a sufficiency review, however, the jury's inference of intent is afforded more deference than the evidence supporting proof of conduct, and circumstantial evidence of a defendant's guilty knowledge

-16-

is not "required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements." *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). The jury is the exclusive judge of the credibility of the evidence on the self-defense issue and is free to believe or disbelieve any or all of the defendant's self-defense evidence. *See Saxton*, 804 S.W.2d at 914.

*Appellant's Argument*

In this point of error, Appellant contends that she proved her self-defense claim by overwhelming evidence and the State failed to refute it by producing evidence of premeditation. But the State was not required to offer evidence of planning or premeditation either to prove that Appellant murdered Loustaunau or to disprove her self-defense claim. *Crane v. State*, 786 S.W.2d 338, 349-50 (Tex.Crim.App. 1990). Appellant does not argue that the evidence is legally or factually insufficient to prove that she intentionally caused Loustaunau's death by shooting him with a firearm. She argues only that the State failed to disprove her theory of self-defense. Thus, we will restrict our review to that issue. For the jury to find Appellant acted in self-defense, it had to find that (1) Appellant was justified in using deadly force against Loustaunau under Section 9.31; (2) a reasonable person in Appellant's situation would not have retreated; and (3) she reasonably believed the deadly force was immediately necessary to prevent Loustaunau's imminent commission of sexual assault. *See* TEX.PENAL CODE ANN. at § 9.32(a).

*Duty to Retreat*

We begin with the second element because Appellant erroneously argues in her brief that she had no duty to retreat. The Penal Code provides that a person using deadly force in self-defense is relieved of the duty to retreat if the other person is committing an offense of unlawful entry in the actor's habitation. *See* TEX.PENAL CODE ANN. § 9.32(b)(Vernon Supp. 2007). Appellant presented

no evidence that Loustaunau had entered Appellant's home unlawfully. To the contrary, the evidence established that he was a guest in her home at the time of the shooting. Consequently, Appellant had a duty to retreat from Loustaunau and she had the burden at trial to offer evidence showing that a reasonable person in her situation would not have retreated. Appellant failed to present any evidence in support of this element of self-defense. For this reason alone, the jury's rejection of Appellant's self-defense claim is reasonable under both the legal and factual sufficiency standards.

*Reasonableness of Appellant's Belief*

The jury could also have found that Appellant did not reasonably believe deadly force was immediately necessary to prevent Loustaunau's imminent commission of sexual assault. The State argues that the jury could have based its rejection of Appellant's self-defense claim on the evidence showing: (1) Appellant's prior threats and violence against Loustaunau; (2) Appellant had a motive other than self-defense for killing Loustaunau; (3) Appellant armed herself prior to the confrontation for a purpose other than self-protection; (4) there were inconsistencies between Appellant's version of the events and the physical and medical evidence, and the testimony of other witnesses; (5) Appellant's flight and attempts to conceal the body and other evidence; and (6) Appellant's failure to call the police or summon medical assistance.

There is evidence demonstrating that Appellant had threatened to kill Loustaunau on more than one occasion and had committed violent acts against him in the past. Her animosity appeared to have been rooted in belief that their affair had ruined her life, he owed her money, and he was not fairly distributing the proceeds from the business. Appellant and Loustaunau were arguing about these same issues at the time of the shooting. The jury could have reasonably found, based on this

evidence, that the shooting occurred as the result of Appellant's perpetual anger and bitterness toward Loustaunau over their personal and business dealings and she carried out her prior threats to kill him.

The jury also heard evidence that Appellant retrieved the gun from the shelf, not for self-protection, but because she often picked up a gun and threatened to kill herself in order to make Loustaunau listen to her. This is precisely what she told Gutierrez. Based on this evidence, the jury could have determined that Appellant had retrieved the gun to make Loustaunau do what she wanted and not because she was afraid of him.

Several portions of Appellant's story were inconsistent with other evidence presented in the case. First, Appellant told Gutierrez and Dr. Gold that she and Loustaunau had been drinking at the time of the shooting. Dr. Stern determined that Loustaunau had no alcohol in his system. Second, Appellant's version of the events did not include an explanation for the bruises, laceration, and puncture wound which Dr. Stern found on Loustaunau's arms. Third, Appellant told Gutierrez and Dr. Gold that she and Loustaunau were startled when the gun accidentally discharged and they stared at each other for a period of time before he charged at her and she fired two more shots. This conflicted with the testimony of Appellant's neighbor, Ramon Gaxiola, who heard what sounded like three gunshots in rapid succession. Fourth, Appellant told Dr. Gold that Loustaunau stuck a bottle of Viagra in her face when he was insisting on having sex with her, but the bottle of Viagra was found inside the victim's briefcase. Given these inconsistencies, the jury could have found that Appellant's claim of self-defense was not credible.

In addition to the foregoing evidence, we note that Appellant made contradictory statements about her intent. She initially stated that the weapon accidentally discharged but later added that she

shot Loustaunau because she believed he intended to sexually assault her. While a defendant is certainly entitled to present inconsistent defenses, Appellant's assertion that she accidentally shot Loustaunau is inconsistent with her self-defense claim. *See Saxton*, 804 S.W.2d at 914. Given Appellant's contradictory statements about the shooting, the jury could have found that the self-defense claim was simply not believable.

After allegedly shooting Loustaunau in self-defense, Appellant did not call 911 to summon the police or EMS. Instead, she stayed up all night dismembering the body, and she cleaned nearly all of the blood from the scene. Appellant buried the torso in the desert at some point before she called Gutierrez early Saturday morning. Based on this evidence, the prosecutor argued to the jury that Appellant intended to dispose of the rest of the body parts and join the Phelpses in Colorado, but her plans were disrupted by Bo's arrival on the scene and his surveillance of the house. The jury could have reasonably inferred from the dismemberment of the body, the cleaning of the crime scene, and Appellant's disposal of the torso--which revealed the cause of death--that Appellant murdered Loustaunau and did not kill him in self-defense. *See Miller v. State*, 177 S.W.3d 177, 184 (Tex.App.--Houston [1st Dist.] 2005, pet. ref'd)(defendant's acts of burying gun and burning clothes he was wearing supported jury's rejection of self-defense); *Valdez v. State*, 841 S.W.2d 41, 43 (Tex.App.--Houston [14th Dist.] 1992, pet. ref'd)(defendant's acts of changing clothes, hiding gun, and disposing of the bullets supported jury's rejection of self-defense); *see also Bradley v. State*, 960 S.W.2d 791, 803 (Tex.App.--El Paso 1997, pet. ref'd)(defendant's mutilation of wife's body showed consciousness of guilt); *Lee v. State*, 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref'd)(defendant's efforts to conceal decomposing body in his rent-house by pouring Pine Sol and ammonia on the body three times a day showed a consciousness of guilt).

When the evidence at trial is taken in the light most favorable to the verdict, it is legally sufficient to support the jury's determination that Appellant intentionally caused Loustaunau's death by shooting him with a firearm. Further, the evidence is legally sufficient to support the jury's rejection of Appellant's self-defense claim.

*Factual Sufficiency*

When the evidence is viewed in a neutral light, there is some evidence that Appellant shot Loustaunau because she believed he intended to sexually assault her. But the State's evidence, when taken alone, is not so weak that it does not support the jury's finding of guilt beyond a reasonable doubt. Further, the evidence supporting the claim of self-defense is not so strong that the jury's rejection of the defense does not meet the beyond-a-reasonable-doubt standard. Having found the evidence both legally and factually sufficient, we overrule Point of Error One.

## RULE OF OPTIONAL COMPLETENESS

In Point of Error Two, Appellant contends that the trial court abused its discretion by refusing to admit the entirety of Dr. Gold's memo into evidence. During direct examination by the prosecutor, Dr. Gold testified at length about her first meeting with Appellant. During cross-examination, the defense established that Dr. Gold had prepared a six-page memorandum summarizing the session. Defense counsel offered the memo into evidence and the prosecutor raised a hearsay objection. The trial court did not rule immediately and took the issue under advisement. The defense continued the cross-examination:

> [Defense counsel]: And, actually, I think you told the jury when Mr. Loustaunau was walking towards her he actually lunged towards her, didn't he?

> [Dr. Gold]: That's the word she used, and it's in my memo in quotation marks. Yes, that is the word she used.

[Defense counsel]: Right. Well, that's the information she provided to you, correct?

[Dr. Gold]: That's correct.

[Defense counsel]: And then even after the first shot when she said it accidentally went off, that he continued to lunge at her, didn't he? That's what she said?

[Dr. Gold]: I believe so. I -- I would have to look at my notes to see exactly how that was worded.

[Defense counsel approached the witness].

[Defense counsel]: Is that correct?

[Dr. Gold]: It reads, She stated that she believed she told him not to come any closer or she would shoot him, and he lunged. She stated that she was looking down at the gun in her hand and not at [Loustaunau] when the gun fired. She recalls that [Loustaunau] continued to lunge.

On re-direct, the State questioned whether Appellant had also stated that she retrieved the weapon before Loustaunau lunged. The prosecutor directed Dr. Gold's attention to the second paragraph on the third page of the memo and asked her to read the portion of the memo discussing when Appellant got the gun:

> [Dr. Gold]: She had mentioned to him that she had been planning to visit Oregon, which she had always longed to do, in the company of some friends. He told her that she was not going to go to Oregon without send-off sex. He produced a bottle of Viagra and stuck it in her face and told her that he was ready. She asked him to leave her alone, but he advanced upon her. She admitted that by this time they both had had far too much to drink. She told him to leave her alone, but he continued to push close to her. She indicated that she lost focus and flashed back to being 12 years old and assaulted by her father. She stated that she grabbed one of the weapons in her home and became aware that she had it in her right hand. She stated that she believes that she told [Loustaunau] not to come any closer or she would shoot him, and he lunged.

Citing the rule of optional completeness, defense counsel then asked that Dr. Gold be permitted to read the next "sentence." Dr. Gold read the rest of the paragraph:

She stated that she was looking down at the gun in her hand and not at [Loustaunau] when the gun fired. She recalls that [Loustaunau] continued to 'lunge' at her, and she continued to fire. She stated that he had reached the place where she was standing and still upright when he said, Love you, babe, and then fell to the floor.

Later in the trial and immediately before defense witness Dr. Rodriguez-Chevres took the stand, defense counsel offered Dr. Gold's memo pursuant to Rule of Evidence 803(5). The State objected that the memo was not admissible. The trial court took the issue under advisement and Dr. Rodriguez-Chevres testified. His evaluation of Appellant included a review of Dr. Gold's memo. Similarly, Dr. Ramirez testified that he had reviewed Dr. Gold's memo. During Dr. Ramirez's testimony, Appellant again offered the memo without articulating the basis of the offer. This time, the trial court excluded the evidence. Prior to resting, the defense re-offered the memo and for the first time cited the rule of optional completeness as a basis for the proffer. The trial court refused to admit the memo.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex.Crim.App. 2005); *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex.Crim.App. 2004). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Apolinar*, 155 S.W.3d at 186. Hearsay statements are generally not admissible unless the statement falls within a recognized exception to the hearsay rule. *Walters v. State*, 247 S.W.3d 204, 217 (Tex.Crim.App. 2007). Rule 107 of the Texas Rules of Evidence, also known as the rule of optional completeness, is one such rule. *Id*. Rule 107 provides:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as

when a letter is read, all letters on the same subject between the same parties may be given. 'Writing or recorded statement' includes depositions.

TEX.R.EVID. 107.

This rule is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party. *Walters*, 247 S.W.3d at 218. It is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing. *Id.* Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence. *Id.* Further, the rule is not invoked by the mere reference to a document, statement, or act. *Id.* The rule's application is limited by the requirement that the omitted portion must (1) be on the same subject and (2) be necessary to make it fully understood. *Sauceda*, 129 S.W.3d at 123. And it is limited by Rule 403, which permits a trial judge to exclude otherwise relevant evidence if its unfair prejudicial effect or its likelihood of confusing the issues substantially outweighs its probative value. *Walters*, 247 S.W.3d at 219; *see* TEX.R.EVID. 403.

The State argues that the trial court properly excluded Dr. Gold's memo because the entirety of it was not on the same subject as the portion read aloud by Dr. Gold during direct examination. Dr. Gold's memo covered her entire conversation with Appellant which took place over more than six hours. At the prosecutor's request, Dr. Gold read only a small portion of the memo which pertained to the moment of the shooting when Appellant retrieved the weapon and fired it as Loustaunau lunged at her. The rest of the memo covers topics including how the appointment was made through Gutierrez, Appellant's history (personal, marital, work, financial, and mental-health

history), Appellant's relationship with Loustaunau, the events on the day of the shooting, Appellant's actions after the shooting, including the dismemberment, the involvement of attorney William Ellis and the police, Dr. Gold's decision to allow Gutierrez to take Appellant to her sister's home, and the admission of Appellant to a psychiatric hospital. Much of the memo was not on the same subject as the portion read into evidence by the prosecutor. Therefore, it was not admissible under Rule 107. Finding no abuse of discretion, we overrule Point of Error Two.

## ADMISSION OF PHYSICAL EVIDENCE

In her third point of error, Appellant challenges the admission of numerous items and general categories of evidence. She argues that all of the evidence was admitted in violation of Rules 401 and 403 of the Texas Rules of Evidence.

Appellant first complains about the admission of a video showing a news report about the trial (Defense Exhibit 1A). This video, which was admitted only for appellate purposes, depicted the "Basic Butchering" book which had not been admitted into evidence at the time of the news story. Appellant's request for a mistrial due to the news coverage was denied because none of the jurors had actually viewed the news report. Because the video was not admitted into evidence, Appellant's argument is without merit.

Appellant also contends that the trial court erred in admitting "numerous photos of the dismembered body parts" and "a gruesome videotape containing the head and the body parts removed from the freezer." Regarding the crime scene videos, Appellant stated that she had no objection to their admission. Therefore, she has not preserved error for review. *See* TEX.R.APP.P. 33.1. As for the photographs, Appellant does not identify any of them by exhibit number, except for something she refers to as Exhibit 147. The trial court did not admit an exhibit

-25-

147. Appellant has not provided any record references where the "numerous photos of the dismembered body parts" were offered and admitted over her objection. Rule 38.1(h) of the Rules of Appellate Procedure requires the appellant to include appropriate citations to authorities and the record. The record in this case is voluminous and many exhibits were admitted during the course of the trial. We decline to scour the record in an effort to identify which exhibits might be referenced in this point of error. We overrule the argument regarding the "numerous photos of the dismembered body parts" as improperly briefed. *See* TEX.R.APP.P. 38.1(h).

Appellant next asserts that numerous weapons, including firearms, a machete, and a hacksaw were seized from her home and introduced into evidence even though the State did not connect them to the offense. She provides exhibit numbers of these weapons, but again, she does not provide any record references where the exhibits were offered into evidence and admitted over her objection. We overrule this portion of Appellant's argument as improperly briefed. *See* TEX.R.APP.P. 38.1(h). Even if Appellant had adequately briefed these issues, our review of the record reflects that defense counsel affirmatively stated that he had no objection to the admission of the firearms, the machete, and the hacksaw. *See* TEX.R.APP.P. 33.1.

Finally, Appellant argues the trial court erred by admitting "[p]hotographs from the desert area where the head and other body parts were discovered . . . . See Exhibits No. 117-136." First, we note that the torso was found buried in the desert and the head and other body parts were found in Appellant's freezer. The exhibits Appellant references in her brief are not photos of the desert area where the torso was discovered. Defense counsel affirmatively stated that he had "no objection" to all but one of the photographs from the desert area where the torso was found. Counsel objected that one of these photographs was cumulative. The alleged error pertaining to that photograph is

waived because the objection made at trial does not comport with the argument raised on appeal. For all of these reasons, we overrule Point of Error Three.

## CHARGE ERROR

In Point of Error Four, Appellant raises several complaints regarding the court's charge. She first contends the evidence did not support the inclusion of an instruction on voluntary intoxication. Appellate review of alleged error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App. 1994). Initially, we determine whether error occurred. *Id.* If so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Id*. at 731-32. A trial court must charge the jury on the law applicable to every issue raised by the evidence. *See* TEX.CODE CRIM.PROC.ANN. art. 36.14 (Vernon 2007)(jury charge of trial judge shall "distinctly set[ ] forth the law applicable to the case"); *Taylor v. State*, 885 S.W.2d 154, 157 (Tex.Crim.App. 1994). Section 8.04(a) of the Penal Code provides that voluntary intoxication does not constitute a defense to the commission of crime. TEX.PENAL CODE ANN. § 8.04(a). If there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions, a voluntary intoxication instruction is proper. *See Taylor*, 885 S.W.2d at 158. Here, Appellant told Gutierrez and Dr. Gold that she and Loustaunau had drunk "too much" just prior to the shooting. She also made statements that the shooting was accidental. Because the jury might have drawn an inference that Appellant mishandled the weapon due to her intoxication causing it to accidentally discharge or that her intoxication otherwise excused her conduct, the trial court did not err in giving this instruction.

Appellant also contends that the trial court erred by refusing to instruct the jury on the lesser-included offense of criminally negligent homicide. In deciding whether a lesser-included offense

-27-

should have been given, we apply a two pronged test. First, the offense must be a lesser-included offense of the charged offense. *Mathis v. State*, 67 S.W.3d 918, 925 (Tex.Crim.App. 2002). Second, we must evaluate the evidence to determine whether a rational jury could find that if the defendant is guilty, she is guilty of only the lesser offense. *Id*. The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Id.*; *Wesbrook v. State*, 29 S.W.3d 103, 113-14 (Tex.Crim.App. 2000). The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. *Banda v. State*, 890 S.W.2d 42, 60 (Tex.Crim.App. 1994). Regardless of its strength or weakness, if any evidence raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex.Crim.App. 1992). An accused is guilty only of a lesser-included offense if there is evidence that affirmatively rebuts or negates an element of the greater offense, or if the evidence is subject to different interpretations, one of which rebuts or negates the crucial element. *See Ramirez v. State*, 976 S.W.2d 219, 227 (Tex.App.--El Paso 1998, pet. ref'd). That the jury may disbelieve crucial evidence pertaining to the greater offense is not sufficient to warrant the submission of the lesser-included offense submission to the jury; there must be some evidence directly germane to the lesser-included offense to warrant such submission. *See Skinner v. State*, 956 S.W.2d 532, 543 (Tex.Crim.App. 1997).

The first prong is met because, as the State concedes, criminally negligent homicide is a lesser included offense of murder. *See Licon v. State*, 99 S.W.3d 918, 928 (Tex.App.--El Paso 2003, no pet.); *Cardona v. State*, 973 S.W.2d 412, 415 (Tex.App.--Austin 1998, no pet.). Turning to the second prong, there must be evidence which would permit the jury to rationally find that if Appellant

-28-

is guilty, she is guilty only of the lesser offense. A person commits criminally negligent homicide by causing the death of another through criminal negligence. TEX.PENAL CODE ANN. § 19.05 (Vernon 2003). A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. TEX.PENAL CODE ANN. § 6.03(d). The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* Thus, criminally negligent homicide requires a finding that the defendant ought to have been aware of the risk but failed to perceive it. Before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk. *Licon*, 99 S.W.3d at 928, *citing Mendieta v. State*, 706 S.W.2d 651, 653 (Tex.Crim.App. 1986).

The evidence showed that Appellant was quite familiar with firearms as she possessed approximately twenty firearms in her home and held a concealed handgun license. There is no evidence that Appellant was unaware of the risk in arming herself with a loaded firearm during an argument and pointing it in the direction of another person. In support of her argument that she was entitled to an instruction on criminally negligent homicide, Appellant points to her statements indicating that the weapon accidentally fired. Evidence of accidental discharge of a weapon does not necessarily raise the issue of criminal negligence. *See Thomas v. State*, 699 S.W.2d 845, 850 (Tex.Crim.App. 1985); *Gadsden v. State*, 915 S.W.2d 620, 622-23 (Tex.App.--El Paso 1996, no pet.). The evidence still must show that the defendant was unaware of the risk created by her conduct under the facts of the case. Because there is no such evidence, the trial court acted properly

by denying the requested instruction.

Appellant next argues that the trial court erred by denying her requested instruction on self-defense. The instruction Appellant requested is not a self-defense instruction but rather is an instruction on the justification of necessity under Section 9.22 of the Penal Code. This section provides that conduct is justified if:

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX.PENAL CODE ANN. § 9.22. When deadly force in self-defense is the conduct that is allegedly "immediately necessary" under the first element of the necessity defense, the defense of necessity does not apply. *See Butler v. State*, 663 S.W.2d 492, 496 (Tex.App.--Dallas 1983), *aff'd*, 736 S.W.2d 668 (Tex.Crim.App. 1987). Consequently, Appellant was not entitled to an instruction on the defense of necessity.

Appellant also contends that the trial court erred by refusing her instructions on "right to arm and seek an explanation," "right to possess arms" and "right to continue shooting." We have previously held that a defendant is not entitled to such self-defense embellishments because they are not recognized by or labeled as defenses by the Legislature. *Castaneda v. State*, 28 S.W.3d 216, 226 (Tex.App.--El Paso 2000, pet. ref'd)("right to arms," "right to shoot to scare," and "right to pursue," are not recognized by the Penal Code as defenses; consequently, defendant is not entitled to these additional self-defense instructions). Other courts have also held that the defendant is not entitled

-30-

to these additional self-defense instructions because they are not recognized by the Legislature and the self-defense instructions authorized by the Penal Code are sufficient to explain the defendant's right to use force and deadly force in self-defense. *See Philen v. State*, 683 S.W.2d 440, 444-45 (Tex.Crim.App. 1984)(defendant not entitled to "right to continue shooting" instruction); *McGowan v. State*, 188 S.W.3d 239, 241-42 (Tex.App.--Waco 2006, pet. ref'd)(defendant not entitled to "right to arm and seek explanation" instruction). The trial court did not abuse its discretion by refusing to submit these additional self-defense instructions. Finding no error in the jury charge, we overrule Appellant's fourth and final point of error and affirm the judgment of the trial court.

August 21, 2008

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.

(Publish)