

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00163-CR

FINNIS DAVIS II                                                                            APPELLANT

V.

THE STATE OF TEXAS                                                                              STATE

----------

## FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Finnis Davis II appeals from his conviction and fifty-year sentence for attempted capital murder. In five points, he challenges the sufficiency of the evidence to support his conviction, the trial court's failure to hold an evidentiary hearing on competency at two different times during the proceedings, the trial court's exclusion of text messages between one of the victims and several third parties, and the trial court's denial of his motion to suppress in-court

---

[1]See Tex. R. App. P. 47.4.

identifications because pretrial photographic lineups were impermissibly suggestive. We affirm.

## Sufficiency of the Evidence

Appellant was convicted of shooting both Saudi Taylor and Oscar Roney during the same criminal episode. *See* Tex. Penal Code Ann. § 15.01 (West 2011), § 19.02(b)(1) (West 2011), § 19.03(a)(7)(A) (West Supp. 2012). He contends that the evidence is insufficient to prove that he shot Roney because the treating paramedic testified that the wound did not look like a normal gunshot wound but rather an entrance wound of some kind. Thus, appellant contends that because Roney could have been struck by shrapnel or flying glass instead, there is no evidence he intended to kill both Roney and Taylor.

The evidence shows that appellant became possessive of Taylor, whom he knew, sending her dozens of text messages a day. Some of those messages were abusive and threatening. On May 3, 2010, Taylor had a first date with Roney. Appellant's text messages to Taylor that night indicate he knew she was out with a man and was upset about it. When the two returned to Taylor's home after the date, Taylor saw appellant sitting in his car backed into her driveway. Taylor told Roney to keep driving, and appellant began following them around the block. When they returned to Taylor's house, appellant hit the back of Roney's car with his car and began shooting at them; he then blocked off Roney's car. At that point, Taylor saw Roney slumped over the wheel with blood all over his

shirt.[2]  After he blocked Roney's car, appellant got out of his car and "started shooting at [Roney's] car."  Taylor testified that appellant "shot at" both of them and that he shot inside Roney's car from the driver's side.  Taylor testified that appellant shot her in the thigh.  Taylor got out of the car, and appellant chased after her; when he caught her, he pistol-whipped her while yelling that he was going to kill her.

Roney testified that appellant "stuck a gun in [his] window" and that he heard a shot from the gun.  He said he had been shot behind his left ear.  Police found blood on the driver's side and what looked like bullet holes in the driver's side doorposts.  Additionally, about a month before trial, Roney was washing his hair and pulled out "a little piece of fragment" about a centimeter long, but he let it go down the shower drain.  One of the police officers who investigated the crime scene testified that Roney was possibly hit by a bullet that had ricocheted or fragmented from hitting the driver's side doorpost.  A paramedic who had treated Roney at the scene testified that although the wound looked like it had a "penetration point" and was some kind of "entrance wound," it did not look like a gunshot wound.

Taylor and Roney both identified appellant in court as the person who "shot at" them.

---

[2]It is unclear from Taylor's testimony whether Roney had suffered the head wound at this time.

Appellant contends that the evidence is insufficient to prove that Roney was actually shot; however, he does not dispute that the evidence shows he shot Taylor. The State was not required to prove that appellant was successful in his attempt to mortally wound Roney; rather, it had to prove that he intended to kill both Taylor and Roney and with that intent, committed "an act amounting to more than mere preparation that tend[ed] but fail[ed] to effect" their deaths. *See id.* §§ 15.01, 19.02(b)(1), 19.03(a)(7)(A); *Ex parte Milner*, 394 S.W.3d 502, 509 (Tex. Crim. App. 2013). The record contains sufficient evidence from which the jury could reasonably conclude that appellant shot at Roney and Taylor with the intent to kill them both. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) ("[T]he specific intent to kill may be inferred from the use of a deadly weapon."). We overrule appellant's first point.

## Competency Finding

In his second and third points, appellant contends that the trial court erred by failing to sua sponte hold an evidentiary hearing before finding him competent to stand trial after a prior finding of incompetency and by failing to sua sponte order a competency examination based on appellant's behavior at trial.

**Lack of Evidentiary Hearing**

The trial court found appellant incompetent to stand trial in September 2011 and ordered him committed to a mental health facility for no more than 120 days. On November 25, 2011, the trial court received from North Texas State Hospital a statutory notification indicating that an evaluator had determined that

4

appellant had regained competency to stand trial. *See* Tex. Code Crim. Proc. Ann. art. 46B.079(b)(1) (West Supp. 2012). The trial court ordered the notification and attached evaluation report sealed. The record shows that the trial court sent copies of the report to appellant's counsel and the State and, on November 28, 2011, issued a bench warrant for appellant to be returned to court. *See id.* art. 46B.081. The record also contains a certificate of proceedings dated December 9, 2011 and signed by the trial judge, with the notation, "found competent."

Article 46B.084 provides that when a defendant is returned to the trial court upon a mental health facility's report that the defendant has gained competency, the trial court may determine the defendant's competency "based on the report . . . and on other medical information or personal history information relating to the defendant." *Id.* art. 46B.084(a). The statute does not require a hearing on the determination unless a party timely objects to the report. *Id.* art. 46B.084(b). The record here contains no objection to the sealed report filed with the trial court. Thus, we conclude and hold that the trial court did not err by failing to hold an evidentiary hearing to determine that appellant had become competent to stand trial.[3] We overrule appellant's second point.

---

[3]We also overrule appellant's January 2013 "Motion For Court to Respond Su[a] Sponte."

**No Sua Sponte Competency Hearing During Trial**

Appellant next argues that the trial court reversibly erred by failing to sua sponte order a competency hearing during trial based on his "irrational" and "incoherent" behavior, his prior MHMR history, his "lack of understanding of his criminal proceeding," and his "numerous absurd and [i]nsensible out[]burst[s]" during trial. Appellant points specifically to a part of the record indicating that the trial court chastised him because he kept turning around and looking at his sister and because he appeared to be attempting to show something unidentified to the jury. He also points to his own testimony during guilt/innocence as indicating a need for the trial court to hold such a hearing.

### Applicable Facts

Before trial, appellant had the following conversation with the trial judge:

THE DEFENDANT: I understood -- I don't understand what's going on, period, because I just got a six-day notice that I was going to trial. I had no idea that I was going to trial. Yes, I've been locked up for 23 months but didn't nobody tell me that we was having a trial.

I haven't been through no procedures. I hadn't had no status conference. I hadn't been through no motion discovery. I hadn't even had no evidence exchange. And then plus this, me and my lawyer, giving me insufficient counseling, and him and the DA been working together. My lawyer been -- well, my lawyer been asking me questions about this case. He asked me questions to hurt me. So I have a feeling that him and the DA is working together. That's why I was trying to speak with you.

And they just started looking for my witnesses last month. This case been going on for two years. Yes, it have. And then -- then start looking for -- I have more than just one witness. So that's what I'm trying to say. How am I going to any chance to get a fair trial with all these odds against me?

6

THE COURT: Okay. Well, number one, it sounds like you have a firm grasp of what's going on and that you've been keeping up with it very closely.

THE DEFENDANT: Right.

THE COURT: So in addition to your plea of not guilty to the count alleging that you committed the attempted capital murder, Count Two alleges that you caused bodily injury to Saudi Taylor by shooting him [sic] with a deadly weapon.

THE DEFENDANT: That's a her.

THE COURT: Okay. Her. You know more about it than I do, obviously.

THE DEFENDANT: Yes, I do.

During voir dire, appellant responded to a juror's comment that someone with a better lawyer has a better chance of being acquitted with "Exactly."

Appellant complained to the court at trial about his counsel:

THE DEFENDANT: I've been feeling that he's [trial counsel] been giving me inefficient counsel, but I don't even have an education. I didn't even graduate from high school. So, therefore, you got to kind of bear with me because y'all all got degrees. I don't. So this is going to be -- it's a lot of things I don't understand because I don't understand --

THE COURT: Okay.

THE DEFENDANT: -- the Court issues.

THE COURT: Talk to me about what your complaint is with [your trial counsel] --

THE DEFENDANT: Oh, my complaint is that I feel that he's not representing me to the fullest. But I don't have a problem with that because you won't -- you wouldn't let me replace him. I can't do

7

nothing if you wouldn't let me replace him.  So I had to roll with what I had. Dot my I's, cross my T's.

THE COURT:  Okay.  So did I not see you shake his hand at the end of the day yesterday and tell him that you thought he did a good job?

THE DEFENDANT:  I said -- yes.  But he did a good job just one time.

Later, appellant and the trial court engaged in the following colloquy:

THE COURT:  Well, sometimes it helps if you listen also.  Yes, you have a right to testify. Is that what you want to do?

THE DEFENDANT:  I guess I have to. I mean, y'all not going to give me a mistrial so I can hire me a new lawyer to do this all over.  So we have to -- I have to.  I'm not going -- I'm not going to let them hear -- let the jury hear they side of the story and it's another side.  Every story have two sides.  This case I feel that they had their side.  My side ain't been heard.  We couldn't even find a witness.

THE COURT:  All right.  So the answer to my question about whether you want to testify is that, yes, you do, correct?

THE DEFENDANT:  I have to.

THE COURT:  No, you do not have to.  It is your choice.

While appellant was testifying on his own behalf, against his counsel's advice, he wanted to address the jury directly; the trial judge had to instruct him he could not do so.  Appellant was nonresponsive to his counsel's questions.  The trial judge then had to call a recess to go in chambers, where defense counsel informed her that he feared appellant was about to commit perjury even though defense counsel had repeatedly warned him not to do so.  In open court, before the jury returned, the trial judge warned appellant of the consequences of perjury.  She then allowed appellant to testify narratively about the events of

May 4, 2010, but he refused to do so. Instead, appellant kept complaining to the jury about his lawyer and telling them that they could not convict someone without a defense who had no education. Appellant kept asking them, "Please give me a hung jury." The trial judge ultimately dismissed the jury and placed appellant in a holdover cell. Before the jury returned, the trial judge talked to appellant again, warning him that she was giving him a last chance to tell the jury what happened the night of May 4, 2010. Appellant was argumentative with the trial judge when she was attempting to explain that she was giving him the opportunity to tell the jury his version of what happened that day. She allowed appellant to confer with his counsel in private.

Before the jury returned to court, appellant asked to speak to his lawyer again, telling the judge she had not given them enough time to finish. But the judge told appellant she had overheard him "cussing at" his counsel and that counsel did not "have to listen to that." When the trial judge explained to appellant that if he tried to tell the jury about anything other than what happened May 4, 2010, she would "cut [him] off," appellant told the trial court, "I'm not behaving irrational." The trial judge said, "I didn't say you were behaving irrational. You're behaving like a not very . . . [c]ooperative person." The following exchange occurred shortly thereafter:

> THE DEFENDANT: I understand. I don't understand -- no, I take that back. I don't understand.
>
> THE COURT: No. I feel like you understand perfectly.

9

THE DEFENDANT: You feel like I understand.

THE COURT: But you don't want to --

THE DEFENDANT: You feel like I understand.

THE COURT: Okay. And --

THE DEFENDANT: But I don't understand. But I'm going to do the best I can.

The trial judge then brought in the jury. When appellant again refused to address the jury about the night of the shootings, the trial court dismissed the jury. As they were leaving, appellant made the following outburst:

THE DEFENDANT: Please, please -- I still be locked up. I'm not going anywhere. If your brothers or sisters were in there, you would want them to have a good representation.

THE BAILIFF: Mr. Davis, be quiet.

THE DEFENDANT: Please don't hang me. I will still be locked up.

THE BAILIFF: Mr. Davis.

THE DEFENDANT: I will have to have another trial. Don't do me this way. I need a lawyer. I got -- I got somebody going to buy me a lawyer.

The trial judge placed appellant in a holdover cell during the charge conference and closing arguments.

During closing, appellant's counsel told the jury,

Finally, as for Mr. Davis' conduct on the stand, I can only say to you that you can also conclude from all of that that Mr. Davis is a very frightened man. Now, that doesn't necessarily change any of the facts that lead him to the point that he's afraid of, but it is the state of mind that he is in.

**Analysis**

Appellant asserts that the above outbursts show that the trial judge should have sua sponte held a hearing inquiring into appellant's competence to stand trial. We disagree.

A trial judge is required to hold a competency hearing if the evidence is sufficient to raise a bona fide doubt in the mind of the judge as to the defendant's competency. *Montoya v. State*, 291 S.W.3d 420, 424 (Tex. Crim. App. 2009). A bona fide doubt may exist if the defendant exhibits truly bizarre behavior or has a recent history of severe mental illness or at least moderate mental retardation. *Id.* at 425. The considerations when evaluating competency to stand trial include the defendant's level of understanding of the proceeding and ability to consult with counsel in preparation for the proceeding. *Id.* at 425–26. Thus, the trial judge, as one who observed the behavior of the defendant at the proceeding in question, is in a better position to determine present competency. *Id.* at 426.

The trial court here initially found appellant incompetent to stand trial and referred him to North Texas State Hospital. However, based on the hospital's report, which we have reviewed, the trial court found that appellant had gained competency. Although appellant's behavior in court was inappropriate and obstreperous, it was not "truly bizarre." In fact, from the context of the entire record, it is clear the trial judge believed appellant understood everything that was occurring and was merely being intentionally argumentative and disruptive. We hold that the trial judge did not abuse her discretion by refusing to hold a

11

hearing during trial inquiring into appellant's competence. *See id.* at 426; *Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999), *cert. denied*, 530 U.S. 1216 (2000); *Francis v. State*, 877 S.W.2d 441, 445 (Tex. App.—Austin 1994, pet. ref'd) ("Unruly or disruptive courtroom behavior is not in itself evidence of incompetence."). We overrule appellant's third point and his motion requesting the same relief.[4]

## Rule of Optional Completeness

In his fourth point, appellant contends the trial court erred by refusing to admit text messages between Taylor and third parties under the rule of optional completeness. His primary argument is that these other messages contain a high level of profanity which would show that she did not necessarily find the profanity in his messages to her offensive and that he had no reason to be jealous of Roney because the evidence shows she regularly sent text messages to other men.

Texas Rule of Evidence 107, the rule of optional completeness, provides as follows:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in

---

[4]However, we grant appellant's July 29, 2013 motion to provide a limited number of copies of filings to this court and his request to supplement the record with the initial competency report filed by defense counsel in September 2011.

12

> evidence, as when a letter is read, all letters on the same subject between the same parties may be given.

Tex. R. Evid. 107. This evidentiary rule "is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) (quoting *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007)). Thus, Rule 107 is not invoked by the mere reference to a document, statement, or act; to be admitted under that rule, "the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make it fully understood.'" *Id.* (quoting *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004)).

Here, the text messages appellant sought to admit are not about the same subject matter. That Taylor used profanity with others or communicated with other men is not necessary to explain the context of the text messages between appellant and Taylor, nor has appellant directed this court or the trial court to any other text message relevant to the same subject matter, i.e., the relationship and communications between appellant and Taylor. There is no evidence that appellant was aware of Taylor's texting with others when he was sending her the text messages that were admitted. Moreover, appellant was able to cross-examine Taylor about the profanity, and she admitted that it was not that unusual for her to use it in text messages or to receive messages with profanity in them. Accordingly, we hold that the trial court did not abuse its discretion by refusing to admit text messages between Taylor and others, and we overrule appellant's

fourth point.  *See Whipple v. State*, 281 S.W.3d 482, 500 (Tex. App.—El Paso 2008, pet. ref'd).

### Admissibility of Identification Via Photographic Lineup

In his fifth point, appellant contends the trial court erred by overruling his pretrial motion to suppress evidence that Roney had identified him from a photographic lineup and by subsequently admitting the evidence at trial. According to appellant, the lineup was impermissibly suggestive because the photographs were "displayed simultaneously and not in a double blind manner."

Whether a pretrial identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor; thus, we review the issue de novo.  *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998).  In determining whether the trial court correctly admitted an in-court identification, we employ a two-step analysis:  first, we examine whether the out-of-court identification procedure was impermissibly suggestive; second, if the procedure was impermissibly suggestive, we examine the totality of the circumstances to determine whether the impermissibly suggestive procedure gave rise to the substantial likelihood of irreparable misidentification.  *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996).  An analysis under these steps requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification.  *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001).  The defendant has the burden to show

by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive and that the in-court identification is unreliable. *Barley*, at 34.

A lineup is considered unduly suggestive if the appearance of other participants is greatly dissimilar from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). A suspect may be greatly dissimilar in appearance from the other participants based on a distinctly different appearance, race, hair color, height, or age. *See id.* But minor discrepancies among lineup participants will not render a lineup impermissibly suggestive. *See Partin v. State*, 635 S.W.2d 923, 926 (Tex. App.—Fort Worth 1982, pet. ref'd). The participants in a lineup do not have to be identical to satisfy the requirements of due process. *See Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985), *cert. denied*, 476 U.S. 1189 (1986).

All of the six men in the lineup are African-American males with the same size, build, and hair color; they all have similar facial hair. Although the camera distance in the shot of the two men in the upper left and lower right corners makes them appear to have smaller heads, the difference is not great and does not render their appearance too dissimilar from the other men. The lineup was not prepared via a double blind procedure, that is, it was not prepared by an officer without knowledge of the identity of the suspect.

The officers who showed the lineup to Taylor and Roney did so at different times and in different places. They told Taylor and Roney that they might or

15

might not recognize anyone in the lineup and did not direct them who to pick. Taylor and Roney were able to identify appellant immediately as the person who shot them. Taylor had known appellant for at least a year to two years before the shooting, and Roney had known him for years because they had grown up in the same neighborhood. Both Roney and Taylor were certain appellant had shot them. Taylor said she was certain because appellant was not a stranger to her and because after he shot her, he beat her. Roney said he picked appellant's photo immediately because he already knew who had shot him.

Although the persons in the lineup are not identical, they resemble each other enough in appearance that any differences, including the variances in the size of their heads because of the camera distance, are negligible. Based on the totality of the circumstances—especially considering that the victims knew appellant and there is no evidence of coercion—we conclude and hold that the lineup was not impermissibly suggestive and that the trial court did not err by denying appellant's motion to suppress and admitting the identifications. We overrule appellant's fifth point.

### Absence of Counsel During Critical Time in Proceedings

Appellant also alleged by motion that he was without the assistance of counsel during a critical time of the proceedings, i.e., during the time for filing a motion for new trial. Appellant filed his pro se notice of appeal on April 12, 2012 and was appointed counsel on April 16, 2012; counsel filed a motion for new trial on April 30, 2012. We conclude and hold that appellant has not shown he was

16

deprived of counsel during a critical stage of the proceedings. *See, e.g., Smith v. State*, 17 S.W.3d 660, 662–63 (Tex. Crim. App. 2000); *cf. Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007) (holding that even if an appellant has been deprived of counsel during a critical stage of the proceedings, he must show harm or prejudice from the deprivation). We overrule appellant's "Motion for an Abatement of Appeal" and all other pending motions not specifically disposed of in this opinion.

## Conclusion

Having overruled appellant's points, we affirm the trial court's judgment.

PER CURIAM

PANEL: LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 24, 2013

17