

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00487-CR

GREGARY ALLEN TURNER                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1343101R

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In five points, appellant Gregary Allen Turner appeals his conviction for aggravated assault with a deadly weapon. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

The State indicted Turner for aggravated assault with a deadly weapon after he ended an argument with his adult son, Gregary Allen Turner Jr. (Junior), by shooting him in the leg. Despite the trial court's self-defense instruction to the jury, the jury found Turner guilty, and the trial court sentenced him to seven years' confinement. This appeal followed.

## III. Sufficiency

In his first point, Turner complains that the evidence is insufficient to support his conviction because there was no evidence that he did not act in self-defense to protect himself from his son's aggressive behavior.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The essential elements of aggravated assault with a deadly weapon here are that Turner intentionally or knowingly caused bodily injury to Junior by shooting him with a firearm, a deadly weapon that Turner used or exhibited during the commission of the assault. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2014), § 22.02(a)(2) (West 2011). A firearm is a deadly weapon per se. *Id.* § 1.07(a)(17)(A) (West Supp. 2014) (defining "deadly

2

weapon" as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury").

After a defendant has introduced some evidence supporting a defense under section 2.03 of the penal code, such as self-defense, the State bears the burden of persuasion to disprove it. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (explaining that a conviction produces an implicit finding against the defensive theory). However, this burden does not require the State to introduce evidence disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Id.* To determine sufficiency of the evidence to disprove a nonaffirmative defense, the appellate court asks "whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the [defensive] issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Smith v. State*, 355 S.W.3d 138, 144–47 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (applying *Saxton* and *Zuliani* to the jury's rejection of the defendant's self-defense and defense-of-third-person theories).

A person is justified in using deadly force against another if he would be justified in using force against the other under penal code section 9.31[2] and when

_____

[2]Under penal code section 9.31, a person is justified in using force against another in self-defense when and to the degree he reasonably believes the force

3

and to the degree he reasonably believes the deadly force is immediately necessary either to protect himself against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of murder (or other offenses which are not applicable here).  Tex. Penal Code Ann. § 9.32(a) (West 2011).  The penal code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor."  *Id.* § 1.07(a)(42) (West Supp. 2014).

## B. Evidence

When Junior was approximately 24 years old, he moved back into his parents' residence.  A year and a half later, Junior was still residing there, but the environment was a tumultuous one.  Junior's mother, Victoria, and his father,

---

is immediately necessary to protect himself against the other's use or attempted use of unlawful force.  Tex. Penal Code Ann. § 9.31(a) (West 2011).  The actor's belief that the force was immediately necessary is presumed reasonable if he did not provoke the person against whom the force was used, was not otherwise engaged in criminal activity, and knew or had reason to believe that the person against whom the force was used (1) had unlawfully and with force entered, or had been attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment; (2) had removed or attempted to remove the actor unlawfully and with force from his habitation, vehicle, or place of business or employment; or (3) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.  *Id.*  The use of force against another is not justified in response to verbal provocation alone.  *Id.* § 9.31(b)(1).  A person is not required to retreat before using force if he has a right to be present at that location, has not provoked the person against whom the force is used, and is not engaged in criminal activity at the time the force is used; a factfinder may not consider whether the actor failed to retreat for purposes of determining whether he reasonably believed that the use of force was necessary.  *Id.* § 9.31(e)–(f).

Turner, had been experiencing marital difficulties for several years, and Turner was in the process of moving out of the house.[3]

Turner and Junior offered conflicting versions of the events leading to the shooting. Junior testified that Turner was and always had been a deadbeat, abusive father and that on February 16, 2012, Turner provoked an argument with him, drew his gun, shot him in the leg, and summarily dismissed him from the house. Turner admitted that he shot Junior on that day but testified both that the shooting resulted from the accidental discharge of his weapon and that he shot Junior in self-defense.

### 1. Junior's Version of Events

Junior testified that about a month before the shooting, Turner, who slept on the living room floor and "made everybody's life a living hell," had pulled a handgun out of the sofa and brandished it at him after Junior denied having changed the station on Turner's radio. According to Junior, on the day of the shooting, Turner came "storming around the kitchen huffing and puffing, eyes bloodshot red," and bumped into him. Turner mumbled and grumbled "Motherf---er," and other vulgarities before proceeding past him. An argument subsequently ensued wherein Turner accused Junior of being the source of problems within his

---

[3]Junior testified that Victoria had given Turner until March 16, 2012, to get out of the house. Turner testified that while Victoria did not have authority to give him a deadline to move out of his own home, he was planning to leave anyway.

5

marriage[4] and asked him when he was going to move out of the house. Junior testified that he responded by laughing and arguing back.[5] According to Junior, their back-and-forth bantering continued for about half an hour before Victoria intervened and started arguing with Turner as well.

Junior continued to participate in the argument for another ten or twenty minutes before his parents dismissed him. He left the house but forgot his keys, so he waited outside until he saw Victoria leave approximately 45 minutes later, then returned into the house to retrieve his keys.

As Junior was exiting the house, he saw Turner leaning on the front door. Junior asked him, "So do you want to explain to me how I am a c--- blocker?" And the quarrel resumed. Once again, Junior either laughed or smirked at Turner's remarks, which escalated the argument.

According to Junior, Turner replied, "You think this sh-- is funny" and walked up on him. Turner continued, "You think this is funny. It wouldn't be funny if I whipped your a--." Junior said that he continued to laugh at his father's attempt to intimidate him because Turner was drunk all the time and "[h]alf the time he falls down on his own when the wind blows too hard." Turner then

---

[4]Junior testified that Turner told him, "You know, you—you're a c--- blocker. I haven't been able to have sex with my wife for five years."

[5]Junior said that he laughed because he found Turner's comments hilarious, and that he also pointed out to Turner that he had only been living with them for three years of the five years Turner was complaining about. He also pointed out, "[M]om never told me to get out; it's you that was supposed to be getting out, not me."

walked up to Junior, "toe to toe," and said, "You wouldn't be so tough, you know, somebody needs to teach you a lesson." Although Turner outweighed him by at least twenty pounds, Junior responded, "You're no match. You're no competition." Although Junior initially did not recall telling Turner that he would mop the floor with him, he agreed that his comments were in the same vein, and he admitted on cross-examination that he had told the police that he told Turner, "I will mop the floor with you."

At this point, according to Junior, Turner nodded his head in agreement, walked around the sofa, reached under the sofa cushion, and pulled out his .9 millimeter Sigma Smith & Wesson gun. Turner then walked back to the front door, cocked the gun, and shot Junior in the left leg in a single motion. The bullet went straight through Junior's leg, entering the front side above the knee and leaving a hole in the back of his leg and through the backside of his jeans. Junior said that when he looked down and saw blood and a hole in his pants, he said, "I'm shot." Turner looked at him up and down, then stepped to the side of the front door and said, "You can go now." Junior said he walked out of the house and called 911 as soon as he reached the end of the street.

Junior testified that prior to the shooting, he had "never ever put any type of hand on [his father], ever in [his] life," and that, aside from the "shoulder check and the belly bumps" that occurred during the incident, Turner had not touched

7

him during the altercation on that day.  Finally, Junior acknowledged having probably smoked marijuana around the time of the altercation.[6]

## 2.  Turner's Version of Events

Turner testified that he loved his son but shot him that day because Junior "was beating [his] a--, and [Turner] was in fear."  Turner said that he had been scared of his son for "quite awhile."

According to Turner, the events began on February 16 when Turner and Victoria were arguing about some missing money and Junior's living in their house.  While they were exchanging words, Junior entered the room and joined the fray, which escalated into name-calling.  Turner testified that Victoria then told Junior to go outside, and Junior complied.  When Victoria later left the house and drove away, Junior returned.

Turner testified that when Junior came downstairs, Junior asked Turner if he could ask him some questions.[7]  According to Turner, when Junior started talking, Turner got up from his chair.  At that point, Junior "put his hands on [him]," and Turner warned him not to do that again.[8]  Turner then left the room momentarily but when he came back, Junior persisted in "tormenting" him with

---

[6]Junior added that he had a marijuana card that allowed him to smoke it legally in California to treat anxiety issues.

[7]Turner said that Junior did not ask this in a nice way, and that he replied, "Yeah, if you allow me to answer them."

[8]Turner testified that he said, "Never do that again.  Don't you ever put your hands on me again.  Don't you never put your hands on me again."

degrading comments. Turner testified that he told Junior to go on about his business and to "leave [him] the F alone," but as Turner moved around the room, Junior rammed into him like he was playing football, causing Turner to hit the inside of the door.

According to Turner, the two began to scuffle, and because Turner was heavier than Junior at the time, he managed to push Junior back. However, Turner, who had recently undergone surgery, said he could not keep him off. At that point, Turner testified that Junior threatened to "mop the floor with him," and so he retrieved the gun for his own protection and told Junior to back away. He testified that he did not raise the gun up but that the gun "just went off." Turner further testified that he did not recall whether he had cocked the gun and that he initially was unsure whether he had shot himself or Junior. Had he not shot Junior, Turner said he did not know "for sure" what would have happened, but he speculated that Junior would have mopped the floor with him because by that point Turner "was out of gas."[9]

Turner did concede that Junior got under his skin and made him mad all the time. He also agreed that he had called Junior a "c--- blocker." But he also testified that he was afraid of his son, so he stayed away from Junior because he did not want to fight him. Turner added that he believed Junior had been "on something" that day because he had not acted like that before.

---

[9]Turner had a subsequent hernia surgery while in county jail awaiting his trial.

9

Turner admitted that he had been living in the living room, and although he denied that his wife had given him a deadline by which to move out of the house, he said he was preparing to move to California within a few weeks. Turner testified that it was his money that had been used to help the family move from California to Texas years earlier, stating, "I ran a small business. I sold cars. I've been doing stuff to earn money all my life.[10] I never just sat around. That's why I wanted to be alone was—I spent so much time raising my kids."

While Turner was in jail awaiting his trial, he wrote to Victoria and told her that the shooting was his fault.

### 3. Other Evidence

Junior's medical records were admitted into evidence and showed that "[a] 9 mm irregularly shaped metallic foreign object" (bullet fragment) was located in the subcutaneous soft tissues of his thigh, "about 9 cm above the knee joint." However, when the police searched the house, attic, and garage, they did not find the gun or an empty .9 millimeter cartridge casing in the house.[11] The crime scene officer testified that she did not notice any signs of a struggle inside the

---

[10]Turner said he had earned money by selling electronic equipment and buying and selling cars at auction.

[11]Turner testified that he was in a daze after firing the gun because he could not believe what had happened. He described himself as "distraught" and testified that he passed the gun off to one of the neighbors who had gathered at the scene because he had just hurt his son and he did not want the gun in his hand.

house, and another officer who responded to the shooting testified that she did not notice any injuries on Turner when he was arrested that day.

The State also called rebuttal witness Ashley Robertson, Junior's twenty-nine-year-old sister. Robertson testified that if Turner had claimed that he had been busy raising the children over the years, that would not be a true statement.[12] Robertson described the family dynamics over the years as "tense," including the years leading up to the shooting, during which time, according to Robertson, her mother was trying to get Turner out of the house.[13] According to Robertson, Turner refused to leave the house, claiming he intended to stay "until he got what was rightfully owed to him." She also testified that the first time Victoria filed for divorce, Turner said that there would be bloodshed if their mother ever left.

Robertson described Turner as the aggressor in the father-son relationship.

Vicky Moore, a maid who was working inside next-door neighbor Ginger Brannon's house on the day of the shooting, also testified. She related that from inside the neighbor's house she could hear male voices arguing in the driveway

---

[12]Robertson testified that during Junior and her childhood years, "[Turner] was kind of out and about doing whatever he did . . . , and he continued that for the majority of [their] growing up." She also stated that Turner never had any gainful employment, nor had he participated in paying bills, the mortgage, or anything else. According to Robertson, Victoria had always been the breadwinner of the family, while Turner spent his time drinking and sleeping.

[13]Robertson also testified that the house was in Victoria's name.

11

and that "the man was upset about the boy preventing him from being able to have sexual relations because he wasn't getting out of the house." A little later Moore was outside in her car smoking a cigarette and talking to her son on the phone. Moore testified that because the front door of Turner's house was ajar, she could hear voices from inside Turner's house. Then she heard "a pop."

Moore testified that "a young boy" ran past her car and said, "That crazy MF just shot me." She watched him run down the road[14] and then told her son, "I have to go. That boy just said his dad shot him." She saw the older man in the doorway, who "just kind of looked, and then he shut the door." He did not go after the young man, ask for help, or yell for 911, according to Moore.

## C. Analysis

No one disputes that Turner shot Junior in the leg with a deadly weapon. Therefore, we must resolve whether, after viewing all the evidence in the light most favorable to the prosecution, any rational juror would have found against Turner on his self-defense claim beyond a reasonable doubt. The evidence here amounted to a credibility battle between Turner, who testified both that he shot Junior accidentally and that he shot Junior to defend himself against Junior's physical attack, and Junior, who said that he did not lay a hand on Turner before Turner shot him. As the jury is the sole judge of the weight and credibility of the

---

[14]Turner disputed this portion of Moore's recitation of events, testifying that Junior did not run but walked slowly out of the house. Junior also testified that he walked out of the house.

12

evidence, *see* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979), and because we must presume that the jury resolved any conflicting inferences in favor of the verdict and defer to that resolution, *see Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170, we conclude that the evidence is sufficient to support the jury's verdict, and we overrule Turner's first point. *See also Allgood v. State*, No. 04-11-00358-CR, 2012 WL 3711695, at *5 (Tex. App.—San Antonio Aug. 29, 2012, pet. ref'd) (mem. op., not designated for publication) (stating that a claim that the gun just "went off" is inconsistent with a self-defense claim); *Whipple v. State*, 281 S.W.3d 482, 497 (Tex. App.—El Paso 2008, pet. ref'd) (affirming murder conviction because evidence reflected, among other things, that appellant made contradictory statements regarding her gun's accidental discharge and self-defense).

## IV. Evidentiary Rulings

In his remaining four points, Turner argues that the trial court abused its discretion by overruling his rule 403 objections, by admitting irrelevant evidence about whether he played an active role in raising his children, and by denying his motion for mistrial after Robertson volunteered evidence of an extraneous offense for which the State had not given notice.

## A. Standard of Review

The admission of evidence is a matter within the trial court's discretion. As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the ruling. *Hill v. State*, 303

S.W.3d 863, 876 (Tex. App.—Fort Worth 2009, pet. ref'd). We likewise review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

## B. Rule of Evidence 403

In his second and fourth points, Turner complains that the trial court abused its discretion by overruling his rule 403 objections and by failing to conduct rule 403's required balancing test.

Rule of evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Tex. R. Evid. 403. In a proper rule 403 analysis, the trial court must balance the inherent probative force of the proffered item of evidence, along with the proponent's need for that evidence against (1) any tendency of the evidence to suggest decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). When rule 403 is invoked, the trial court is presumed to engage in the required balancing test, and silence of the record will not imply otherwise. *Williams v.*

14

*State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).  Therefore, we overrule this portion of Turner's second and fourth points.

### 1.  Objection to Junior's Testimony about Abuse

In the remainder of his second point, Turner argues that Junior's testimony about how abusive Turner had been while he was growing up showed all of Turner's bad acts and gave the jury the false impression that Turner must have been the aggressor in the confrontation.

During trial, in a hearing outside the jury's presence, Turner objected to Junior's testimony about Turner's prior assaults on him and his abusive childhood environment.  The State replied that it was not offering the evidence to show character conformity but rather to show Turner's motive in shooting Junior and to rebut the character trait that Turner was a peaceful person.  The State contended that it would be misleading to the jury not to have information about the relationship between Junior and Turner in order to provide context to the shooting incident.[15]  The State further argued that Turner had opened the door to this evidence by "making him out to be a peaceful person."  Finally, relying on *Jones v. State*, 241 S.W.3d 666 (Tex. App.—Texarkana 2007, no pet.), the State argued that the evidence was admissible to rebut the defensive theory of self-

---

[15]During the hearing, Junior testified that Turner had been abusive to him by punching him and kicking him and constantly subjecting him to verbal abuse. Junior said that he never hit Turner back and that it was always Junior who "was the punching bag."  Junior said that Turner subjected everyone to verbal abuse.

defense.[16]   The trial court overruled Turner's objections and agreed to give a limiting instruction to the jury.

The jury then heard Junior's testimony, that Turner was "frightening" when Junior was growing up, that Junior was "[c]ussed at, fussed at, punched, kicked, whatever, anything goes," and that he frequently "got punched" and "beat up for just random stuff like acting out in school, getting in trouble at school" and for not cleaning the kitchen after he was told to do so.  In addition to testimony regarding Turner's abusive behavior in general, Junior also testified as to specific instances of abusive behavior.  Junior recounted the first abusive incident that occurred when Turner accused Junior of stealing his bike patches.  He testified that he did not know what bike patches were and did not know what to look for; nevertheless, Turner told him to "go find them" anyway.

Junior testified that the abuse was both physical and verbal, and that Turner would make threats when he came home drunk every night after the bar closed.  He said he knew that Turner kept a gun in the couch because Turner had pulled it out a month before the shooting and threatened him with it when he accused Junior of changing his radio station to a rap station.  Junior also testified

---

[16]In *Jones*, the trial court allowed the State to introduce two earlier circumstances of physical violence by the defendant against his then-wife, the complainant, in response to his reliance on self-defense in his opening statement.  241 S.W.3d at 668–69.  The Texarkana court held that under those circumstances, when the defendant plainly stated in his opening statement that he was going to rely on a claim of self-defense in the altercation that occurred between him and the complainant, he opened the door for the State to show other incidents in which he had "visited violence" upon her.  *Id.* at 669–70.

that Turner commonly threatened that "[t]here will be bloodshed" when something happened in the house.

When a defendant raises self-defense, motive becomes an issue, *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975), and "[i]n some circumstances, positions or defenses first posited during an opening statement are subject to impeachment." *Jones*, 241 S.W.3d at 669 (citing *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001)); *see also Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) ("Our case law supports a decision that a defense opening statement . . . opens the door to the admission of extraneous-offense evidence . . . to rebut the defensive theory presented in the defense opening statement."); *Powell*, 63 S.W.3d at 439–40 (stating that even though opening statements are not evidence, the trial court has the discretion to admit extraneous offense evidence to rebut a defensive theory raised in an opening statement).

Turner raised self-defense during his opening statement, painting Junior as a moocher and a thug who threatened to mop the floor with his father during a physical altercation and contending that Turner shot his son in the leg to defend himself. By stating that he planned to rely on a self-defense claim in the altercation, Turner opened the door to the State's showing other incidents of violence by Turner upon Junior, to rebut the defense raised in his opening statement. *See Jones*, 241 S.W.3d at 669–70. Under the circumstances, we cannot say that the probative value of this evidence was substantially outweighed

17

by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Likewise, the short hearing on whether the evidence was admissible and the presentation of the evidence itself did not raise considerations of undue delay or, at the time, needless presentation of cumulative evidence. Additionally, the trial court's limiting instruction either eliminated or reduced the potential that Junior's testimony about their past relationship would impress the jury in some irrational, indelible way. *See Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd). Therefore, we conclude that the trial court did not abuse its discretion by overruling Turner's rule 403 objection and admitting the evidence, and we overrule the remainder of Turner's second point.

### 2. Objection to Robertson's Testimony about Abuse

In the remainder of his fourth point, Turner claims that the trial court abused its discretion by admitting Robertson's testimony over his rule 403 objection because the proper predicate was not laid for the introduction of the State's rebuttal evidence. The State responds that Turner did not preserve this complaint for our review because he did not secure a ruling on his rule 403 objection during the hearing outside of the jury's presence and did not raise a rule 403 objection during her testimony before the jury.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Everitt v. State,* 407 S.W.3d

18

259, 262–63 (Tex. Crim. App. 2013); *Sanchez v. State*, 418 S.W.3d 302, 306 (Tex. App.—Fort Worth 2013, pet. ref'd). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt*, 407 S.W.3d at 263. A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Prior to receiving Robertson's testimony, the trial court conducted a hearing at which time both the prosecutor and the defense attorney questioned Robertson outside of the jury's presence. During the voir dire examination, Robertson stated that Turner was not involved much in raising her and her siblings—"[h]e would come home at night for the most part, but as for being an active part in [their] rearing and upbringing, no." Robertson said that Turner had lied if he testified that he had been busy raising the children and that she had never known him to have a steady job.

Robertson testified that she had lived in the family home for a short time before the shooting but had moved out because she could not take living with Turner, an alcoholic who drank all the time. She testified that while she was living there, she never saw Junior lay a hand on Turner and that if she had to identify one of the men as the aggressor in their relationship, it would be Turner. Robertson described Turner as very physically abusive when she was growing up and said that she had seen him kick Junior and hit him with a closed fist.

19

When asked if she thought her father loved Junior, Robertson stated, "I don't think my dad loves anybody." Robertson said that the house was in her mother's name and that Turner did not pay for the house and did not contribute to the household as much as her mother. She confirmed that her mother, who was living in New Jersey at the time of trial and did not testify, had filed for divorce at the time of the shooting.

At the conclusion of the voir dire examination, Turner objected that rather than rebuttal, Robertson's testimony constituted nothing more than character assassination, particularly with regard to Turner's alcoholism and lack of support to the family. Turner further objected that Robertson's testimony was "more highly prejudicial than any probative value" under rule 403. The trial court ruled that because Turner had testified about his having worked, having had income, and having supported the family, "certain aspects" of Robertson's testimony would be proper for rebuttal. However, the trial court also acknowledged that it had concerns for yet "other aspects" of the testimony that the court might find "may very well be objectionable." The trial court then permitted the State to call Robertson as a witness but cautioned that if Turner objected to "certain aspects" of Robertson's testimony, the trial court would sustain the objection "at that time."[17]

---

[17]As the State points out, the trial court made it clear that Turner would be required to object during Robertson's testimony before the jury and that the court would consider and rule on those objections at that time; therefore, the court's comments cannot fairly be considered an implicit ruling. *Cf.* Tex. R. App. P.

20

During Robertson's testimony before the jury, the State asked whether she would say that Turner played an active role in raising the five children. Turner objected to relevance, and the trial court overruled the objection. Turner did not raise a rule 403 objection during Robertson's testimony before the jury. Therefore, because Turner did not preserve this complaint for our review, we overrule the remainder of his fourth point.

## C. Relevance

In his third point, Turner complains that the trial court abused its discretion by admitting irrelevant evidence with regard to Robertson's rebuttal testimony that he did not play an active role in raising his children. Turner contends that this evidence was not relevant to any issue in the case under rule of evidence 401, that it only served to prejudice the jury against him, and that the trial court admitted this evidence in violation of rule of evidence 404(b).

During Robertson's testimony before the jury, Turner lodged a relevancy objection only once—when the prosecutor asked her whether Turner had played an active role in raising his children. After the trial court ruled on Turner's objection, the State rephrased the question and asked, "If your dad just testified that he was so busy raising kids, would that be a true statement?" Robertson answered the second question without objection. Therefore, Turner did not

33.1(a)(2)(A) (stating that the trial court may either expressly or implicitly rule on an objection).

21

preserve his rule 404(b) argument, and we overrule Turner's third point. *See* Tex. R. App. P. 33.1.

## D. Extraneous Offense

In his fifth point, Turner argues that the trial court abused its discretion by denying his motion for mistrial after Robertson volunteered that Turner's previous business had involved selling illegal cable boxes.

The following colloquy occurred during the trial:

> Q. Now, did you know your—your dad to have a job in California?
>
> A. My father never had any gainful employment. He had a business called Hayes Electronics, which he sold illegal cable boxes to people that were shipped at that –
>
> [Defense counsel]: Your Honor, I'm going to object to that. We'll call it an extraneous offense here. We haven't been notified.
>
> THE COURT: I'll sustain the objection.
>
> [Defense counsel]: And I ask that you tell – instruct the jury to disregard that answer.
>
> THE COURT: Ladies and gentlemen, please disregard that answer of the witness.
>
> [Defense counsel]: And we'd ask for a mistrial.
>
> THE COURT: That motion is denied.

A mistrial is required only in extreme circumstances—when the prejudice caused by the improper question and answer is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v.*

22

*State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). In most instances, an instruction to disregard will cure the alleged harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001); *White v. State*, 395 S.W.3d 828, 838 (Tex. App.—Fort Worth 2013, no pet.). A mistrial should be granted only in cases where the inadvertent reference to an extraneous offense was "'clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds.'" *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App.) (quoting *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998)), *cert. denied*, 558 U.S. 1093 (2009). In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of the conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Robertson's reference to this extraneous offense does not appear to be calculated to inflame the minds of the jury. As the record indicates, her testimony regarding the selling of illegal cable boxes was volunteered—in the nature of an afterthought—after Robertson had already answered the question posed to her by the State. Moreover, the trial court immediately sustained Turner's objection and instructed the jury to disregard this testimony. We presume that the jury followed the trial court's instruction absent evidence to the contrary. *See Ladd*, 3

23

S.W.3d at 567. Additionally, no other references were made to the illegal aspect of Turner's business, and the trial court's charge on guilt-innocence instructed the jury that it could only consider testimony about other offenses if it found and believed beyond a reasonable doubt that Turner had committed them and then only for determining motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, if any, in connection with the instant offense.

Nor was the remark of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. In light of the testimony about Turner's deficiencies as a father, his alcohol abuse, and the facts and circumstances that preceded the shooting, we cannot say that Robertson's brief remark about Turner's involvement with illegal cable boxes could have affected the certainty of his conviction. That is, the trial court could have reasonably concluded that the testimony about an illegal act that did not involve abuse or violence, in light of all of the other testimony pertaining to the actual offense and Turner's personal and family history, was not so inflammatory as to be incurable by an instruction to disregard. Therefore, we conclude that any harm caused by the complained-of statement was cured by the instruction to disregard and that the trial court consequently did not abuse its discretion by denying the motion for mistrial. *See Young*, 283 S.W.3d at 878 ("A witness's inadvertent reference to an extraneous offense is generally cured by a prompt instruction to disregard."). We overrule Turner's fifth point.

## V. Conclusion

Having overruled all of Turner's points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  WALKER, GABRIEL, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 13, 2015